COUNTY COMMISSIONERS OF QUEEN ANNE'S
COUNTY, ET AL. *v.* MILES, ET UX.

[No. 136, September Term, 1966.]

356

358

*Decided April 12, 1967.*

The cause was argued before HAMMOND, C. J., and MARBURY, OPPENHEIMER, MCWILLIAMS and FINAN, JJ.

*William H. Adkins, II* and *James E. Thompson, Jr.,* with whom was *Robert R. Price, Jr.* on the brief, for appellants.

*Clarence W. Miles,* with whom were *Robert L. Karwacki* and *Vachel A. Downes, Jr.* on the brief, for appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

The substantive issues presented in this appeal are whether the action of the County Commissioners of Queen Anne's

County (the Commissioners), in promulgating as part of its comprehensive zoning ordinance an "R-1" Estate District with a five acre minimum lot size, is constitutional insofar as it affects the property of the appellees and other properties similarly situated; and, if the classification is constitutional, whether the Commissioners' action is invalid because of arbitrary, unreasonable and discriminatory action in the classification of the property of the appellees and other similar properties as R-1 as contrasted with the A-1 classifications of other allegedly similar properties in like areas.

Queen Anne's County on the Eastern Shore of Maryland has an area of 373 square miles. Of the 23 counties and the City of Baltimore which constitute the 24 political subdivisions of the State of Maryland, Queen Anne's County is the fifteenth largest subdivision in terms of land area. Of the 24 subdivisions, the County is the third smallest subdivision in terms of population, ranking ahead of Calvert and Kent Counties only. On the basis of the 1950-1960 census figures for Maryland, the County had a population of 14,579 in 1950 and of 16,569 in 1960, an increase in population of 1990 persons, or 13.5 percent, during the decade. During the same period, the population of the State increased from 1,343,001 in 1950 to 2,100,689 in 1960, an increase for the decade of 32.3 percent.

The estimated population of the County in 1970, according to the U. S. Census of Population Projections, is from 19,900 to 20,600, and in 1980, from 25,000 to 27,000. According to the U. S. Census definitions of "urban" and "rural", the entire population of the County is classified as "rural." The eight incorporated towns in the County in 1960 contained together only approximately 20 percent of the total population; the largest of these towns, Centreville, contained less than 2,000 people. The greatest rate of growth in the County during the decade 1950-1960 was on Kent Island, which is the eastern terminus of the Chesapeake Bay Bridge; the population of the Island during the decade increased by 909 persons, a gain of over 41 percent.

The major economic activities of the County include agriculture and seafood catching and processing. The County has a total water frontage of 258 miles. There are many large land-

holdings and estates improved by substantial residences, often of historic significance.

At the outbreak of the Revolution, Queen Anne's was one of the most prosperous counties in the State and a number of the large houses throughout the County, still in existence, were built about that time. The tendency then, as in the present day, was to build on the water, which not only afforded more picturesque sites but served as access to water transportation. The abolition of slavery resulted in the erection of a number of small houses in the midst of little clearings, often in proximity to the old Tidewater estates. Emory, *Queen Anne's County, Maryland, Its Early History and Development*, 270, 530-31 (The Maryland Historical Society, 1950).

In January, 1961, pursuant to Code (1957) Article 66B, the Commissioners appointed a Planning and Zoning Commission (the Commission) which, with the Commissioners, is an appellant herein. The Commission, composed of men from various parts of the County, employed professional planners, met frequently, consulted numerous State and County agencies and studied the entire County in detail. On the recommendations of the Commission, intervening ordinances and subdivision regulations were adopted by the Commissioners. In mid-1963, tentative drafts of a comprehensive zoning ordinance and a proposed zoning map were submitted to the Commission and reviewed by it in conjunction with various State agencies. The Commission received the suggestions and advice of interested citizens and civic groups in the County, including the Real Estate Board and the Bar Association. Numerous public meetings were held throughout the County. In April, 1964, the ordinance and map were recommended by the Commission to the Commissioners. The ordinance and map were adopted by the Commissioners on June 16, 1964, substantially in the form recommended by the Commission.

The property of the appellees, known as "Blakeford", was purchased by them in 1957 from the Whitehall Foundation. Three other farms owned by the Foundation were acquired by the appellees at the same time; two of these farms, referred to as the "Stevens Farm", were sold virtually simultaneously by the appellees at the time of their acquisition of Blakeford.

Blakeford in its present form consists of approximately 588 acres; it is located on the east side of the Chester River immediately north of Queenstown Creek and fronts on the Chester River for a distance of 7200 feet and on Queenstown Creek for a distance of 9000 feet. Blakeford was described by one real estate expert "as a property almost in one class by itself, equal to or above any in charm and elegance * * *" The main dwelling, as shown in the exhibits, is a beautiful manor house. There are eight other residential structures and numerous farm buildings. The improvements include a swimming pool, a greenhouse and over 12 acres of lawn, shrubbery and ornamental plantings. Of the 588 acres, 300 are devoted to a dairy cattle operation conducted by the appellees. The average daily production of milk on the farm in 1964 was 200 gallons, all of which was sold commercially. The gross revenue derived from the dairy operation in that year was over $58,000; the gross expenses were over $82,000, including some $18,000 for labor. The aggregate investment by the appellees in assets related totally to the farming operation, exclusive of buildings and land, amounts to over $99,000.

The appellees repeatedly made objections to the Commissioners and the Commission to the classification of their property within the five acre minimum lot district and made alternate suggestions to the Commissioners which, after consideration, the Commissioners rejected.

These proceedings were instituted under the Declaratory Judgment Act, Code (1957) Article 31A, in the Circuit Court for Queen Anne's County promptly after the adoption of the zoning ordinance and map. The appellants demurred to the bill of complaint and the demurrer was overruled. After an extensive hearing and the introduction of numerous exhibits, Judge Rollins held that the ordinance was invalid insofar as its provisions related to and affected the appellees' property and similar properties located in the County in the R-1 District. The briefs and arguments on this appeal have been of great help to this Court.

I

The threshold procedural question is whether the action of the trial court in overruling the appellants' demurrer to the

appellees' bill of complaint was correct. The bill of complaint alleged the unconstitutionality of the classification of the appellees' property, the nature and use of Blakeford, and the irreparable loss because of the severe restrictions upon the use of their property, with supporting reasons for the expected decrease in value. The bill also alleged that the classification is arbitrary and unreasonable, and set forth details as to the similarity of Blakeford and the adjoining Stevens Farm, which is classified as "A-1" Agricultural. The relief prayed was a declaration of the unconstitutionality of the ordinance and an injunction against its enforcement. While the demurrer raised several legal contentions, the only argument relied upon by the appellants in this Court is the appellees' lack of requisite standing.

This Court has repeatedly held that demurrers should rarely be sustained or bills dismissed without a declaration of the rights of the parties when declaratory judgment relief is prayed. *Myers v. Chief of Fire Bureau,* 237 Md. 583, 591, 207 A. 2d 467 (1965), and cases therein cited. Constitutional rights are not to be determined abstractly under the Declaratory Judgment Act or otherwise. *Liberto v. State's Attorney,* 223 Md. 356, 361, 164 A. 2d 719 (1960). We find that the allegations of the bill are sufficient to show that the appellees' rights are affected by the ordinance and that they will sustain special damage by its enforcement. *Richmark Realty Co. v. Whittlif,* 226 Md. 273, 281, 173 A. 2d 196 (1961), and cases therein cited. See also Case, *Declaratory Judgments in Maryland,* 6 Md. L. Rev. 221, 225 (1942). The alleged special damage to the appellees was present, not future, in the immediate effect upon the value of their property. We agree with the action of the court below in overruling the demurrer.

II

The first substantive question is whether the zoning ordinance is valid under the enabling act. The ordinance provides for five residential zones, two business and three industrial zones, including an M-O floating zone, one agricultural and one agricultural conservation zone. The A-1 Agricultural District permits, inter alia, agriculture, grazing and the usual agri-

cultural buildings and structures and single-family and two-family dwellings, with a one acre minimum lot requirement. For the Residence Districts R-1 through R-5, the minimum lot area requirements go from 7,000 square feet in R-5 to five acres in R-1.

In the R-1 Estate District, the principal permitted uses are single-family dwellings, churches and parish houses, schools and colleges, farms, gardens, estates, forests and private game preserves, and the usual agricultural, grazing, forestry and conservation uses and structures. Certain conditional uses, including country clubs, parks and playgrounds and private airports are permitted with the authorization of the Board of Appeals.

There are three R-1 Districts, together constituting only 6.7 percent of the land area of the County. One of the districts is made up of Wye Island, an additional area between the Wye and the Wye East Rivers and the lower end of the peninsula formed by the Wye River and Eastern Bay. Much of this area is contiguous to that area of Talbot County where the zoning ordinance provides, on certain conditions, for an increase in the minimum building lot area to five acres. The two other R-1 Districts are located for the most part on the Chester River; one extends from Winchester Creek to the southern boundary of the Ferguson Farm which is located on the peninsula bounded by the Chester River and Reed's Creek; the other is between the Corsica River and South East Creek. The appellees' property is located in the second of the three areas described. All of the three areas have frontage on what is referred to in the testimony as "good" or "broad" water. Fifty properties are included in the three R-1 Districts, with an average area of about 320 acres per property. Only three of the tracts are under five acres in size. The properties are generally improved by substantial residences and outbuildings. There are a number of similar residences not included in the R-1 District. The total water front of the properties in the R-1 District is 77 miles, which is 29.80 percent of the total water frontage of the County.

The appellees, with exemplary fairness, concede that a five acre minimum lot size in a comprehensive zoning ordinance is not invalid per se. They concede also that, while the classifica-

tion severely restricts the resale of their property, it is not confiscatory. They do contend, however, and we agree, that the weight of the evidence establishes that in a property such as Blakeford it is more difficult to sell five acre lots than lots of three acres or less, and that the resale value of Blakeford, for development purposes, is decreased by its zoning classification. The testimony clearly establishes the standing of the appellees to attack the constitutionality of the ordinance as applied to their property and other property similarly situated.

The legal principles involved are not in dispute. Zoning is an exercise of the police power and, to be valid, must be in the general public interest for the promotion of the health, safety or general welfare of the community. *Nectow v. City of Cambridge,* 277 U. S. 183 (1928) ; *Creative School v. Montgomery County Bd. of Apps.,* 242 Md. 552, 219 A. 2d 789 (1966) ; and cases therein cited. There is a strong presumption of the correctness of original comprehensive zoning. *Gorin v. Board of County Comm'rs,* 244 Md. 106, 112, 223 A. 2d 237 (1966) ; *Board of County Comm'rs v. Edmonds,* 240 Md. 680, 687, 215 A. 2d 209 (1965), and cases therein cited. The duty of the courts not to substitute their judgment for that of the legislative authority, acting within its powers, however, is no more imperative than the duty to set aside any purported exercise of such power which is arbitrary, capricious or illegal. *Maryland Advertising Co. v. City of Baltimore,* 199 Md. 214, 222, 86 A. 2d 169 (1952). See also *Walker v. Board of County Comm'rs,* 208 Md. 72, 87, 116 A. 2d 393, *cert. denied,* 350 U. S. 902 (1955). But the burden of overcoming the presumption of the constitutionality of legislative action is a heavy one. *Gilmor v. City of Baltimore,* 205 Md. 557, 564-65, 109 A. 2d 739 (1954).

The enabling act under which the Commissioners passed the ordinance is Code (1957) Article 66B, Section 21. Subsection (a) of that act gives the legislative bodies of counties, cities and other incorporated areas the right to zone "[f]or the purpose of promoting health, safety, morals or the general welfare of the community * * *" Subsection (c) reads as follows:

> *"Purposes in view.*—Such regulations shall be made in accordance with a comprehensive plan and designed

> to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality."

The appellees strongly and ably contend that it is clear from the evidence that the primary purpose in zoning Blakeford and comparable properties as R-1 Estates was to preserve certain sections of the County, encompassing the great majority of the desirable water frontage on the Chester and Wye Rivers, in their present state, and that the properties were so zoned in order that they could be disposed of only to "substantial" people, of "more than ample" financial resources. The imposition of the restrictions in the R-1 District for such a purpose, it is argued, is not within the power delegated to the Commissioners because the power to zone can only be exercised for the promotion of some substantial public purpose. The appellees rely upon the fundamental principle that restrictions imposed under the police power cannot be supported on the basis of individual private benefit. *England v. Rockville,* 230 Md. 43, 185 A. 2d 378 (1962); *Kracke v. Weinberg,* 197 Md. 339, 79 A. 2d 387 (1951); *Perellis v. City of Baltimore,* 190 Md. 86, 57 A. 2d 341 (1948).

The phrases quoted by the appellees were used by Mr. Kenneth L. Wilson, who served as chairman of the Commission for over four years. However, Mr. Wilson testified further that there were many criteria considered in the decision to establish an R-1 District. He pointed out that the R-1 areas are generally located some distance from the most densely populated sections of the County, and, if there were a heavy density

of population in the R-1 areas, problems would be presented which do not arise under the present use. The properties are relatively highly assessed, and produce good tax revenues for the community while requiring very little general cost to the municipal government. Many, although by no means all, of the historical sites of the County are located in the R-1 zone "and it contributes to the general culture and historical importance of the County to preserve these and protect them in some way."

Mr. Archibald Coleman Rogers, a planning expert who testified for the appellees, while of the opinion that the classifications in the R-1 zone were not proper or reasonable and while disagreeing with the method of gradation used in creating the area districts, agreed that it is desirable to attract to the community some people of means, and that, in zoning, it is appropriate to consider historical associations. Mr. Julian Tarrant, a planning consultant who aided the Commission, testified that the concept of the R-1 District was that it should include large areas of contiguous and predominantly similar properties, having a community of interest based on such common factors "as the broad open water of the Chester River or the especially attractive waters of the Wye River," the properties being generally large and without small lot development. Other considerations, he said, were the relative seclusion of the areas and the incidence of historic factors, "an atmosphere of the early history of Queen Anne's County." Communities of a similar character such as those along the James River in Virginia, he testified, have proved to be valuable to the state and to the county in attracting owners of substantial means and tourists who contribute to the economy.

Mr. Oscar Sutermeister, a consulting planner, who has been a consultant to the Maryland State Planning Department and several county and city planning and zoning commissions in the State, called by the appellants, testified that the system of zoning classification in the Queen Anne's ordinance is "perfectly reasonable for a rural county in a highly urbanized area." He was of the opinion that, in view of all the circumstances, the stated intent of the ordinance with respect to the R-1 zone, to preserve the character of the areas by preventing them from being

cut up into small lot subdivisions was proper, and that, under the circumstances, the minimum five acre lot size was very reasonable.

On the expected effect of the comprehensive zoning plan on the housing needs of persons in the County in various economic situations, Mr. Tarrant testified as follows:

> "If I may put it this way, your Honor, we have provided areas for all the different kinds of housing and the requirements for different kinds of housing that we know about in the County, by which there is apparently some need or demand from the most modest up to the highest, the lowest standards that would be acceptable up to the highest standards. We seem to have quite a wide range of that type of development in the County and also a demand for it. In doing so we have provided five types of R or residential districts, R-1, R-2, R-3, R-4 and R-5. The standards applied to these different districts designed in that order, that is, R-1 being the most restrictive, and R-5 the least restrictive as to the standards which apply in each district, with each one designed to meet a specific need in the County, leveling to the lowest one, the R-5. Generally that's the area where the most modest kind of home are of a type on the smallest size lots would be permitted, and would seem to meet the need for the very lowest income home occupants, including even the migratory or seasonal workers that have to be housed, and we have provided amply for those needs in a number of different locations in the County, particularly near the industrial areas, and it is not a question of forcing people to go into one district or another. We are simply providing different types of areas to meet different needs, different size lots with different size income, we will say, and different standards that apply, and that's the sense of our zoning."

Mr. Tarrant further testified that, while the primary purpose in establishing the R-1 District was as a part of a comprehensive scheme of districts in which there would be a variety of

types of districts to meet the various needs, including the small lot, urban-type houses, the suburban or rural-type and farm living, to the estate-type living, the R-1 District also contributes directly to the health and safety of the County. The low density of the District, he believed, minimizes the sanitation problems which exist in other parts of the County and reduces the traffic problems on the local roads. The limitation of the density in the R-1 District, in his opinion, tends to channel the denser population growth into locations nearer the centers of public service, the established towns and other centers where there are fire-fighting, police and water facilities.

The appellants contend that the general zoning purposes set forth in Section 21(a) of the enabling act are in the disjunctive, and that there is substantial evidence in the record to show that the ordinance tends to accomplish several of the specific purposes enumerated in Section 21(c), including the lessening of congestion in the streets, the promotion of health, the prevention of undue concentration of population, and the promotion of fire safety and adequate provision of water and sewerage and other public requirements. The position of the appellees is that when the County has attempted to exercise the power to zone primarily for the protection of the wealthy who live in the district, as they argue is the case here, the sovereign power is not exercised for the promotion of a substantial public purpose but rather for the private benefit of individuals, and is therefore invalid. They submit that cases in other jurisdictions have rejected such zoning as is here involved as an improper exercise of the police power.

We agree that if the primary purpose or effect of the ordinance is to benefit private interests, rather than the public welfare, the legislation cannot be held valid merely because some of its incidental effects may be for the general good. On the other hand, if the ordinance has a substantial relationship to the general welfare of the community in that it can fairly be taken as a reasonable effort to plan for the future within the framework of the County's economic and social life, it is not unconstitutional because under it some persons may suffer loss and others be benefited. Courts of other states have had occasion to balance these factors; the decisions, as we read them,

turn on the various economic, physical and sociological factors involved in the particular case.

*Board of County Supervisors of Fairfax County v. Carper,* 200 Va. 653, 107 S. E. 2d 390 (1959), held invalid a county zoning law fixing a two acre minimum lot size in the western two-thirds of the county. Ninety percent of the people lived in the eastern one-third. The population of the county had more than doubled in seven years. The court said the practical effect of the ordinance was to force people in low income brackets to live in the eastern area, reserving the western area for those who could afford to buy two acres or more. "This," the court said, "would serve private rather than public interests." 200 Va. at 661.

In *National Land and Investment Co. v. Kohn,* 419 Pa. 504, 215 A. 2d 597 (1966), thirty percent of Easttown Township was placed in the most restrictive zone, with a minimum lot area of four acres. The township, consisting of some eight square miles, was in the path of population expansion. The ordinance was held unconstitutional. The court said: "A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities can not be held valid." 419 Pa. at 532. It was pointed out in the opinion that there was nothing about the township which differentiated it from any other area in the southeastern section of Pennsylvania.

On the other hand, *Simon v. Town of Needham,* 311 Mass. 560, 42 N. E. 2d 516 (1942), held valid a one-acre restriction as to a suburb of Boston, consisting of some 8,000 acres, with a population of 13,000. Needham was found to be essentially a rural-residential community and included country estates. The court said:

> "The establishment of a neighborhood of homes in such a way as to avoid congestion in the streets, to secure safety from fire and other dangers, to prevent overcrowding of land, to obtain adequate light, air and sunshine, and to enable it to be furnished with transportation, water, light, sewer and other public

necessities, which when established would tend to improve and beautify the town and would harmonize with the natural characteristics of the locality, could be materially facilitated by a regulation that prescribed a reasonable minimum area for house lots. The area was to be determined not only in the light of present needs of the public but also with a view to the probable requirements of the public that would arise in the immediate future from the normal development of the land." 311 Mass. at 563.

In *Senior v. Zoning Comm'n of New Canaan*, 146 Conn. 531, 153 A. 2d 415 (1959), *appeal dismissed,* 363 U. S. 143 (1960), an amendment of the zoning regulations increased the minimum lot area in a zone of 4,000 acres from two to four acres. New Canaan had a population of under 16,000. The zone involved was the entire northerly portion of the town, semi-rural in development, heavily wooded, an area of great natural beauty. The number of building sites in the four-acre zone was less than one-sixth of the total of the smaller sites in the remainder of the township. The rezoning was held valid.

*Honeck v. County of Cook,* 12 Ill. 2d 257, 146 N. E. 2d 35 (1957), upheld the constitutionality of a county zoning ordinance requiring land to be used for single family purposes in not less than five acre plots. The court held that there was room for fair differences of opinion as to the reasonableness of the requirement and that the presumption of the validity of the zoning classification governed. In *State ex rel. Grant v. Kiefaber,* 114 Ohio App. 279, 181 N. E. 2d 905 (1960), a similar conclusion was reached on the same reasoning as to the constitutionality of a two-acre minimum zoning requirement in a zone comprising a little over ten percent of the township area, in which there were substantial country homes. See also Reps, *The Zoning of Undeveloped Areas,* 3 Syracuse L. Rev. 292 (1952) ; Note, *County Zoning in Iowa,* 45 Iowa L. Rev. 743, 750-52 (1960) ; Annot., *Validity of Zoning Regulations Prescribing Minimum Area, etc.,* 95 A.L.R.2d 716 (1964).

*Simon* and *Senior,* in our opinion, dealt with circumstances far more like those in the case before us than did *Carper* and

*Kohn.* Here, the land in the R-1 District is only 6.7 percent of the County; in *Carper,* two-thirds of the county had the minimum lot requirement, and in *Kohn* the four-acre minimum applied to 30 percent of the township. Fairfax County was in the midst of a population explosion and Easttown Township was in the path of one. The population of Queen Anne's County is small and is not expected to increase more than 25 percent in the next ten years. The distinctive nature of the water-front county and the many historic sites in Queen Anne's had no counterpart in *Carper* and *Kohn.* While, not unexpectedly, the experts differed as to various aspects of the reasonableness of the ordinance, they agreed that the preservation of such sites is a proper criterion in zoning. Certainly, the concept of preserving some aspects of the past is not alien to our law.

There was strong affirmative evidence that the ordinance makes fair and reasonable provision for all the different kinds of housing required in the County. The situation in this respect is similar to that in *Simon* and *Senior,* and dissimilar to that in *Carper* and *Kohn.* That a zoning ordinance endeavors to shape the future within the general framework of existing conditions does not render it arbitrary or unreasonable.

In *Walker v. Board of County Comm'rs, supra,* the zoning ordinance of Talbot County was held valid. Judge Collins, for the Court, pointed out that the ordinance "adopted by the Commissioners reflected not only competent professional study, but consideration over a long period of time by the Commission and the general public." 208 Md. at 93. Similar study and consideration, while not in themselves determinative, preceded the adoption of the ordinance in Queen Anne's County. Judge Collins said further: "The Ordinance, as adopted, was consistent with the fundamental framework of the County's economic and social life, and such as to promote the health, safety and general welfare of its citizens." 208 Md. at 93. We think the record in this case fairly supports such an interpretation of the Queen Anne's ordinance, and that the appellees have not met their burden of showing that the ordinance is arbitrary or unreasonable.

The benefits to the estate owners in the R-1 District, in our opinion, are not the primary purpose or effect of the ordinance,

but may be reasonably considered only incidental to the attempt to promote the general welfare. This Court has held that the issuance of municipal bonds, the proceeds of which were to be used to acquire a site for and contribute to the cost of constructing a building for a privately owned manufacturing company, served a public purpose, despite the obvious benefit to the private corporation. *City of Frostburg v. Jenkins,* 215 Md. 9, 16, 136 A. 2d 852 (1957). Judge Henderson, for the Court, referred to the expected increase in employment and the contribution to the municipality's financial well-being. See also *Lerch v. Maryland Port Auth.,* 240 Md. 438, 445-52, 214 A. 2d 761 (1965). Here, the Commissioners expect analogous community benefits through the attraction of individual wealth, by the preservation, in some measure, of existing conditions.

The appellees in support of their position that the restrictions on lots in the R-1 District are for private rather than the public good quote from an opinion in *Vickers v. Township Comm. of Gloucester Township,* 37 N. J. 232, 181 A. 2d 129 (1962), *cert. denied,* 371 U. S. 233 (1963). That case held, in a five to two decision, that a township zoning ordinance amendment barring trailer camps from its industrial district was a valid exercise of the zoning power. The appellees' quotations are from the dissenting opinion. More apposite, we think, is the following from the majority opinion:

> "[I]f the township is to avoid the 'deleterious impact' which one use may have upon other uses and encourage 'the most appropriate use of land throughout such municipality,' it must be concerned with the future as well as the present values of property. Our recent decisions have uniformly held, in conformance with the constitutional provisions and the zoning statutes hereinbefore cited, that 'general welfare' should be given a broad interpretation * * * If the zoning ordinance is reasonably calculated to advance the community as a social, economic and political unit, it furthers the general welfare and therefore is a proper exercise of the zoning power." 37 N. J. at 247. (Asterisks indicate citations omitted).

Conditions in Queen Anne's County may change. Megalopolis, in its sweep, may engulf even Maryland's Eastern Shore. With increasing leisure and the endemic yearning for life on the water front, the five acre limitation as applied to the County's river frontage may prove too restrictive. Section 21.1 of the ordinance provides for district changes and other amendments whenever "the public necessity, convenience, general welfare or good zoning practice require * * *"

We hold that, apart from the question of improper discrimination, the five acre minimum lot size of the zoning ordinance in the R-1 District as applied to the property of the appellees and other similar properties, is valid.

### III

Much of the testimony in the court below went to the issue of whether the ordinance was invalid because it treated like properties in unjustifiably dissimilar ways. That allegation was made in the appellees' bill of complaint. Judge Rollins did not reach the question, because of his decision that the ordinance bore no relation to the health, safety or general welfare insofar as it affects the property of the appellees and similar properties. However, the issue was argued below and in the briefs and oral arguments in this Court. Inasmuch as we disagree with Judge Rollins' holding on the question he decided, we deem it desirable to consider the issue of alleged arbitrary discrimination, to avoid the expense and delay of another appeal. Maryland Rule 885; *Montgomery County v. Glassman Constr. Co.,* 245 Md. 192, 225 A. 2d 448 (1967) ; *Panamerican Consulting Co. v. Brown,* 238 Md. 438, 447, 209 A. 2d 575 (1965).

The appellees contend, as they argued below, that there is no ascertainable difference in relative territorial use, topography, improvements or other related characteristics between Blakeford, and two other properties, known as the Kimberly and McKenny Farms, all zoned R-1, and ten other properties, all zoned A-1. (We assume, arguendo, that the Kimberly and McKenny Farms are in all material respects similar to Blakeford). The discrimination, the appellees submit, is arbitrary and unlawful, in violation of the Equal Protection Clause of

the Fourteenth Amendment and of the Maryland law. They contend that there is no reasonable rationale which supports the Commissioners' classification of certain water-front farms in the County in R-1 Districts and other water-front farms in the A-1 District. They point to the fact that Mr. Tarrant, the appellants' consultant, had originally proposed that most of the ten properties be classified R-1 but that the ordinance classified them all as A-1. They rely heavily, in any event, upon the facts as to the various properties set forth in the testimony and exhibits.

The nature of the R-1 District has been discussed in Part II of this opinion, and the general classification which it makes has been found reasonable. The valid creation of a district in a comprehensive zoning ordinance does not depend upon a definition of its purpose, but upon the reasonableness of the permitted uses and the restrictions imposed as to lot areas and other similar matters. *1 Rathkopf, Zoning and Planning,* ch. 12 (1964).

The changes in Mr. Tarrant's proposed classification were made in the Commission's recommendations prior to the adoption of the ordinance, after careful study of the properties by the members of the Commission, who were residents of the County and familiar with all its aspects. In any event, adoption of a comprehensive zoning plan is a legislative function; that function, under the enabling act, is delegated to the Commissioners; the recommendations of the Commission were a guide, but could not supplant the Commissioners' responsibilities to make their own decisions. *Board of County Comm'rs v. Edmonds, supra,* at 240 Md. 684-88. The principal question, however, is whether the different treatment of the properties, on the facts, was arbitrary or capricious. If so, the classification is invalid. *Richmark Realty Co. v. Whittlif,* 226 Md. 273, 283, 173 A. 2d 196 (1961) ; *Benner v. Tribbitt,* 190 Md. 6, 20, 57 A. 2d 346 (1948).

The cogency of the appellees' contention that the classifications are arbitrary and capricious is illustrated by a comparison of Blakeford and the Stevens Farm. Prior to 1957, two of the three other farms owned by the Foundation from which the appellees purchased their property, consisting of some 600

acres and now constituting the Stevens Farm, were operated as a single enterprise with Blakeford. The Blakeford and Stevens properties are divided for the most part by Queenstown Creek, but for approximately one-half mile have a common, unfenced boundary. Both properties are used for farm and residential purposes. Blakeford is used chiefly as a dairy farm and the Stevens Farm, which is southeast of Blakeford, for the breeding and sale of purebred hogs. At the entrance to Blakeford is the unincorporated settlement known as Gouldtown, containing twelve or fourteen families. The topography and soil of both properties are roughly similar. Blakeford is zoned R-1, the Stevens Farm A-1, which permits subdivision of the land into lots with a minimum size of one acre and housing not more than two families. In an A-1 District, certain conditional uses are permitted, subject to the authorization of the Board of Appeals, including sand and gravel pits, hospitals and sanitoriums, motels, trailer parks, boat harbors and penal and correctional institutions. Mr. Rogers, the planning expert called by the appellees, stated unequivocally that, in his opinion, there was no distinction between the two properties.

The witnesses of the appellants did not agree. They pointed out that the Stevens Farm, while it has excellent water frontage on one side, does not front on the broad waters of the Chester River, as does Blakeford. Neither the quality nor condition of the residences on the two properties is comparable. Most of Blakeford is a peninsula. There is a gravel pit adjacent to the eastern boundary of the Stevens Farm, separated from it only by a county road. Also in that area, east of the farm, are a dump for old automobiles, a substantial building used for the storage of beer, buildings and machinery of a ready-mix concrete business and an automobile repair shop. The Stevens Farm is less than one and a half miles from the center of Queenstown, an incorporated town whose population in 1960 was 355. The population of Queenstown has increased over 12 percent in the decade between 1950 and 1960; Mr. Rogers stated, flatly, that Gouldtown will not grow. Mr. Wilson, chairman of the Commission, was of the opinion that the expansion of Queenstown would eventually force subdivision of the land and that the area on the east side of the Stevens

Farm was appropriate for the development of the industrial zone which already exists there. He testified that there had been considerable discussion of the boundary line between the two properties, but that the Stevens property in no way resembles Blakeford. "You just can't deny the presence of two or three miles of water front immediately on your front doorstep or adjacent to it." Mr. Tarrant testified that the Stevens Farm was not of the calibre or character of the other properties fronting on the Chester River which measure up to the R-1 criteria. It lies relatively inland, its water frontage is not on the primary river but on a back creek, and it is exposed to the industrial development on the east, immediately across the county road.

The 400 acre Ferguson farm, zoned A-1, unlike the Stevens Farm, is located on the Chester River, south of Reed's Creek. The main residence, a two and a half story frame house, is not comparable to the Blakeford residence, and is oriented towards Reed's Creek, rather than the Chester River. The Ferguson land along the Chester water front is low and marshy. The property has no historic value. Adjacent to the property, on the creek side, is a small subdivision and a public landing.

The Williamson and Gibbons-Neff properties are also located on the Chester River, contiguous to each other. The first property consists of over 500 acres, the second of over 300 acres. Both are improved by beautiful homes and are used for farming or cattle purposes. In these respects, both are like Blakeford. However, the Williamson property abuts a major highway, U.S. 213, and, although the home is half a mile from the highway, there is a bowling alley on a tract adjacent to the property, and a commercial development further down the highway. The Gibbons-Neff property, to the south, has a commercial marina adjoining it. The Williamson property is immediately adjacent to Kings Town, a suburb of Chestertown, and the Gibbons-Neff property, south of the Williamson tract is close to Kings Town. Mr. Rogers testified that while Gouldtown, the small settlement at the gate of Blakeford, will not grow, Kings Town, in his opinion, will.

The Hardy farm, containing 150 acres, is located on the Wye River on which it fronts about 8500 feet; it has a beautiful

main residence and the usual amenities of a water front estate, as well as facilities for farming and the raising of hogs. However, the property is close to several small-lot subdivisions; it is separated from other similar properties; and there is a public landing on the other side of a creek which the Hardy property adjoins.

Another tract zoned A-1, is the Gilpatric property, which is located on the broad waters of Eastern Bay, and consists of about 850 acres, with 15,000 feet of water frontage. It is improved by a substantial and attractive residence. However, like the Hardy property, it is not surrounded by properties of like type, but stands by itself. It is close to several areas of small lots and houses, and there is an adjacent public landing. The Edel property adjoins the Gilpatric farm to the south. In 1963, prior to the adoption of the ordinance, most of the tract had been sold for development purposes. The small remaining parcel is bordered on two sides by the property so sold. Mr. Tarrant was of the opinion that this whole section of the County seems to be going into small-lot, higher density development.

Goldsborough Hall, containing 473 acres, and the Carpenter property, with about 590 acres, and with respective water frontages of 12,000 feet and 13,800 feet, are located on Kent Island. Each is improved by a substantial and attractive main residence. Each is surrounded on three sides by the waters of several creeks, tributaries of Eastern Bay. The community dump, however, is almost adjacent to their fourth side. The population of Kent Island, according to the U. S. Census of Population, increased by over 40 percent during the decade from 1950 to 1960. Mr. Wilson gave the reasons why the Commission zoned these properties A-1, as follows:

> "These properties both generally are located in what, for generally, for want of a better expression, in a subdivision area of a small lot community, which is what has become of a great part of Kent Island. Furthermore they have excellent accessibility to the Bay bridge. Probably not more than three to four miles from the end of the Bay bridge, and it is our belief that before many years that those properties

either will be put into small lots or surrounded by small lot development."

Kennersley, one of the most historic properties in the County, contains over 400 acres. The exterior walls of its brick manor house have not been changed in over 200 years. The property is situated at the juncture of Island and Southeast Creeks and overlooks the Chester River, with a mile of water frontage. It is zoned A-1, although one of the R-1 areas lies directly across Island Creek. However, Kennersley contains a commercial marina, with a marine railway and at least 28 slips for boats up to fifty feet in length. There is a public landing almost adjacent to the property.

A person who contends that there has been a denial of the equal protection of the laws has the burden of showing that his situation is the same as another situation, and that the State, or its instrumentalities, has treated the two situations differently in an unreasonable or arbitrary manner. *Creative School v. Montgomery County Bd. of Apps., supra,* at 242 Md. 572. As Judge Hammond (now Chief Judge) said for the Court in *Furnace Branch Land Co. v. Board of Comm'rs,* 232 Md. 536, 194 A. 2d 640 (1963) :

> "We reiterated in *Crowther, Inc. v. Johnson,* 225 Md. 379, as we have held in many cases before and since, that the court, in reviewing the action of zoning authorities, will not substitute its judgment for that of the authority unless the latter's action was arbitrary, capricious or illegal and that if the facts were sufficient to support the decision the question decided was fairly debatable and the decision must be upheld." 232 Md. at 540.

In the words of Chief Judge Brune, for the Court, in *Montgomery County Council v. Gendleman,* 227 Md. 491, 177 A. 2d 687 (1962) :

> "Zoning and rezoning do require the drawing of lines, and the legislative body may draw them subject to the same limitations as are applicable to other phases of the zoning process." 227 Md. at 498.

See also *Pahl v. County Bd. of Apps.*, 237 Md. 294, 297, 206 A. 2d 245 (1965), and cases therein cited. A zone boundary which was a property line has been upheld. *Greenblatt v. Toney Schloss Properties Corp.*, 235 Md. 9, 200 A. 2d 70 (1964).

As is shown by the testimony as to the similarities of and the differences between Blakeford and the two other properties zoned R-1, on the one hand, and the ten properties zoned A-1 on the other, there is no one feature which characterizes the R-1 properties which some of the A-1 tracts do not share. The R-1 areas front on broad water, but so do some of the A-1 estates. The presence of historic sites is not confined to the R-1 areas, nor is the existence of properties large in acreage and improved by substantial, attractive residences. Nevertheless, the properties in the three R-1 zones are generally parts of a homogeneous group and resemble each other. As entities, they share the various characteristics to which reference has been made. The ten A-1 properties, while individually possessing one or more of the same characteristics, may reasonably be regarded as distinguishable from the properties in the R-1 zones in various ways. Some are near centers of population which are expanding, or expected to expand, by the development of relatively small dwelling lots. Others are near industrial or commercial developments, or contain or are near marinas or public landings for boats. In many cases, the A-1 properties are relatively isolated from contiguous, similar properties, such as, for the most part, are grouped in the R-1 zones.

The Commission and the Commissioners, with sound reasons, may well have classified some of the A-1 properties as R-1, or some of the R-1 properties as A-1 or in a residential district with a smaller requirement for dwellings lots. That these possibilities were carefully considered is evident. That the conclusions of the deliberations were always wise may be doubtful. That the decisions as to the classifications were fairly debatable, however, in our judgment, is apparent.

We find that the appellees have not met their burden of showing that the classifications of which they complain were arbitrary, unreasonable or capricious.

> *Decree reversed; costs to be paid by appellees.*