Charlotte W. BARNARD

v.

ZONING BOARD OF APPEALS OF the
TOWN OF YARMOUTH.

Supreme Judicial Court of Maine.

Jan. 3, 1974.

Nixon & Corson, by David J. Corson, Yarmouth, for plaintiff.

Bernstein, Shur, Sawyer & Nelson, by F. Paul, Frinsko, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

POMEROY, Justice.

"Building zone laws are of modern origin. They began in this country about 25 years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally

arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinance, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall."

Thus wrote Mr. Justice Sutherland for the United States Supreme Court in Euclid v. Ambler Co., 272 U.S. 365, 386–387, 47 S.Ct. 114, 118, 71 L.Ed. 303, 310 (1926).

Today we are required to examine a zoning ordinance enacted by the Town of Yarmouth to determine if it "after giving due weight to the new conditions," is to be found "clearly not to conform to the Constitution."

The vehicle by which we are assigned our task is an appeal seasonably entered pursuant to Rule 80B, M.R.C.P., from a decision of the Board of Appeals of the Town of Yarmouth subsequently affirmed by the Superior Court.

The decision of which appellant complains was the denial of an application for a variance from the minimum lot size requirements of the Yarmouth zoning ordinance. The appeal before us causes these issues to surface:

a. Whether the requirement of 30,000 square feet for any use is unreasonable and an unconstitutional abuse of the zoning power as applied to the Prince's Point area of the Town of Yarmouth, wherein appellant's property is situated, and

b. Whether the denial of the requested variance by the Yarmouth Board of Zoning Appeals was arbitrary, capricious, or unreasonable, in light of the alleged "undue hardship" which appellant asserts will befall her as a result of the decision.

We have examined the ordinance and found it not constitutionally wanting.

We have considered appellant's claim the action of the Board of Zoning Appeals was "arbitrary, capricious or unreasonable" and found such complaint not well founded.

We, therefore, deny the appeal.

A full understanding of appellant's claims requires some examination of the physical characteristics of her property, as well as those of the area immediately surrounding it.

Appellant owns a large lot, comprising approximately 40,000 square feet. A good portion of the lot fronts on the ocean, and it is undeniable that the property occupies a most desirable location.

As appellant has carefully documented, the lot in question was at one time divided into two parcels, although they became one upon conveyance to appellant's mother in 1934. During the time when the lots were in separate ownership, a dwelling house was built on one parcel. The house remains today, and is used chiefly as a summer recreational retreat by relatives of the appellant and her husband. We might add that the existing house represents the chief obstacle to appellant's intended use of the remainder of the lot as a site for a home.

Appellant's plans for the construction of the home would include functional division of the existing lot so that the remaining portions would be roughly co-equal, each containing approximately 20,000 square feet.

The Prince's Point area of Yarmouth is a relatively populous segment of the Town comprised of 35 to 40 house lots, on which are constructed, for the most part, "winterized" homes formerly built and used as summer cottages. With the exception of appel-

lant's property and very few other parcels, the lots on Prince's Point are generally less than 20,000 square feet in size.

The Yarmouth zoning ordinance places Prince's Point, and hence appellant's property in the "R–A Single Family Residence District," requiring, as we have already noted, a minimum lot size of 30,000 square feet for any use or building permitted within the applicable provision of the ordinance, Article V(2). The entire "R–A" zone is approximately three miles in length and one and one-half miles in breadth. Excepting the Prince's Point area, in which a majority of the lots are nonconforming, the "R–A" zone is made up of undeveloped land or conforming lots.

The parties here have stipulated to the proper adoption of the Yarmouth zoning ordinance and the propriety of and compliance with the procedures leading to this appeal, to wit, the Yarmouth building inspector's denial of appellant's application for a building permit, a subsequent appeal hearing and the Board of Appeals' affirmation of the building inspector's action. We are concerned, then, only with appellant's substantive claims respecting the validity of minimum lot size requirement in general, and as applied to the peculiar characteristics and location of her property.

As a framework for considering the general validity of the minimum lot requirement challenged by appellant, we are obliged to re-emphasize the rather heavy burden which must be borne by an aggrieved party under the ordinance. In Wright v. Michaud, 160 Me. 164, 200 A.2d 543 (1964), we elaborated those standards by which the provisions of a "comprehensive zoning ordinance" must be evaluated, when challenged:

"Every presumption is to be made in favor of the constitutionality of an ordinance passed in pursuance of statutory authority. It will not be declared unconstitutional without clear and irrefutable evidence that it infringes the paramount law." 200 A.2d 543, 550.

With respect to particular provisions of an ordinance,

"[T]he test is whether the prohibition is unreasonable, arbitrary, or discriminatory based upon the reasonably foreseeable future development of the community." *Id.* at 549.

It scarcely requires repeating that any zoning ordinance must also be tested against the fundamental requirement that the restrictions embodied in the ordinance ". . . bear a substantial relation to the public health, safety, morals or general welfare of the public." *Id.* at 547; York Harbor Village Corporation v. Libby et al., 126 Me. 537, 140 A. 382 (1928); Toulouse et al. v. Board of Zoning Adjustment, 147 Me. 387, 87 A.2d 670 (1952). Similar language was employed in the enabling legislation of 30 M.R.S.A. under which the Yarmouth ordinance was adopted. Title 30, Sec. 4953(2) prior to its repeal in 1971,[1] provided that:

"A zoning ordinance shall be drafted as an integral part of a comprehensive plan for municipal development, and promotion of health, safety and general welfare of the residents of the municipality."[2]

1. P.L.1971, c. 455, Sec. 3.

2. The broad provisions of this section are now embodied in 30 M.R.S.A. §§ 4961–4962, enacted in P.L.1971, c. 455, Sec. 2. Sec. 4962(1)(A.) retains the requirement that an ordinance ". . . shall be pursuant to and consistent with a comprehensive plan adopted by its legislative body."

Sec. 4961(1) provides an exhaustive statutory definition of a "comprehensive plan," and states, *inter alia*, that such a plan ". . . shall mean a compilation of policy statements, goals, standards, maps and pertinent data relative to the past, present and future trends of the municipality with respect to its population, housing, economics, social patterns, land use, and water resources and their use, transportation fa-

In Wright v. Michaud, supra, we recognized that the already broad and flexible phrase "general welfare" has been repeatedly invoked as justification for widely-ranging municipal zoning schemes:

"With the development of the law of zoning and the inclusion in enabling acts of provisions for comprehensive planning for municipal development there has been a tendency to broaden the scope of the meaning of the term 'general welfare' in determining the purposes for which zoning ordinances may be enacted." 200 A.2d 543, 547–548.

We consider it well-established that, from the community standpoint, there are numerous practical and logical interests legitimately served by restrictive zoning, particularly when the individual restrictions, e. g., minimum lot size, minimum floor space and minimum frontage, are promulgated as part of a comprehensive municipal planning and zoning scheme founded on lawful objectives. Communities cannot be condemned for seeking such ends as preservation of open space and local "beauty," avoidance of heavy traffic congestion and overcrowded housing, maintenance of property values, or even the stabilization of the burdens of spending for municipal services.

However, we are mindful that zoning has been used frequently for ends which while ostensibly within the traditional objectives of zoning—protection of health, safety, morals and general welfare—are in *fact* unrelated to those purposes.

Thus, the zoning power has been exercised, under the guise of community planning, to prevent the construction of low-income housing in suburban, as distinguished from inner-city areas. The undeniable effect of such a restraint is the exclusion of poor and moderate income families (and concomitantly, the exclusion of ethnic and racial minorities) from desirable residential areas.[3]

Recognizing this potential for abuse inhering in the zoning power, both federal and state courts have in recent years ordered modifications in zoning plans on equal protection and due process grounds. See e. g., Southern Alameda Spanish Speaking Organization v. Union City, 424 F.2d 291 (9th Cir. 1970); Appeal of Kit-Mar Builders, Inc., 439 Pa. 466, 268 A.2d 765 (1970); Oakwood at Madison, Inc. v. Township of Madison, 117 N.J.Super. 11, 283 A.2d 353 (1971).

In *Kit-Mar Builders*, the Pennsylvania Supreme Court struck down as unconstitutional an ordinance which required minimum lot sizes of two and three acres for single dwelling units. Reaffirming its decision in National Land and Investment Co. v. Easttown Township Board of Adjustment, 419 Pa. 504, 215 A.2d 597 (1965), the Court stated that:

". . . a scheme of zoning that has an exclusionary purpose or result is not acceptable in Pennsylvania. We do not intend to say, of course, that minimum lot size requirements are inherently unreasonable. Planning considerations and other interests can justify reasonably varying lot sizes in given areas of a community. 'At some point along the spectrum, however, the size of lots ceases to be a concern requiring public regulation and becomes simply a matter of private preference.' 419 Pa. at 524, 215 A.2d at 608. . . . [M]inimum lot sizes of the magnitude required by this ordinance are a great deal larger than what should be considered as a *necessary* size for the building of a house, and are therefore not the proper subjects of public regulation." 268 A.2d at 766–767

cilities and public facilities prepared by the municipal planning board, agency or office."

3. See, "Exclusionary Zoning and Equal Protection," 84 Harv.L.Rev. 1645 (1971);

Sager, Lawrence Gene, "Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent," 21 Stanford L.Rev. 767 (1969); Report of the National Advisory Commission on Civil Disorders 22 (1968).

(Emphasis in original) (Footnotes omitted).

The *Kit-Mar* Court explicitly recognized a critical distinction between legitimate and illegitimate zoning:

"We once again reaffirm our past authority and refuse to allow the township to do precisely what we have never permitted—keep out people, rather than make community improvements." *Id.* at 768.

◼ The general rule is that minimum lot size requirements, when reasonable, are the proper subjects of the zoning power, since under appropriate circumstances they relate to the legitimate needs of the community in controlling congestion, assuring adequate health and safety by providing light and air, enabling sewage disposal, and minimizing the dangers from spread of fire.[4] Guided by varying factual considerations and statutory foundations for the municipal zoning power, numerous tribunals have approved widely ranging minimum lot restrictions. Fulling v. Palumbo, 21 N.Y.2d 30, 286 N.Y.S.2d 249, 233 N.E. 2d 272 (1967) (12,000 square feet); State v. Dean, 109 N.H. 245, 248 A.2d 707 (1968) (37,500 square feet); County Commissioners of Queen Anne's Co. v. Miles, 246 Md. 355, 228 A.2d 450 (1967) (5 acres);[5] Steel Hill Development, Inc. v. Town of Sanbornton, 469 F.2d 956 (1st Cir. 1972).[6]

◼ Without yet considering the impact of the 30,000 square feet requirement upon plaintiff's property in particular, we are convinced that, when measured against the standards outlined above, the restriction is reasonable and within the constitutional limits of the police power delegated by statute.

In reaching this conclusion, we emphasize the importance of the fact that the restriction is part of a long-range plan for development of the Town of Yarmouth, and represents an expression of community policy, rather than an isolated response to conditions obtaining in one geographical segment of the town.

◼ As appellant correctly points out, the Prince's Point area does differ ·from the remainder of the "R–A" zone in Yarmouth to the extent that a majority of the uses in Prince's Point are nonconforming by virtue of the minimum lot restriction. The existence of these nonconforming uses in one section of the larger zone does not, however, diminish the town's power to determine that the substantially nonconforming section ought to be subject to the same future restrictions as the overall zone. Nor is the existence of the nonconforming section sufficient to rebut the strongly presumed constitutionality of the ordinance itself.

Were we to hold otherwise, municipalities in Maine would be unable to arrest or

---

4. See generally 2 Anderson, American Law of Zoning, Sec. 8.47 (1968); Simon v. Needham, 311 Mass. 560, 42 N.E.2d 516 (1942); Clemons v. Los Angeles, 36 Cal.2d 95, 222 P.2d 439 (1950); 95 A.L.R.2d 716, and cases cited therein.

5. One acre contains 43,560 square feet.

6. Although the ordinance as well as the factual context considered by the First Circuit in *Steel Hill Development, Inc.*, is considerably different than in this case, the decision is significant in its recognition of the community interests which may be involved in a lot restriction ordinance. The Court upheld the decision of the District Court (D.N.H.), which found that the adoption by the town of Sanbornton, N.H., of a

rezoning ordinance which increased from 35,000 square feet to 3 and 6 acres the lot requirements on land owned by a developer, was not arbitrary and unreasonable. In passing on the justification for the ordinance, the Court stated:

"We recognize, as within the general welfare, concerns relating to the construction and integration of hundreds of new homes which would have an irreversible effect on the area's ecological balance, destroy scenic values, decrease open space, significantly change the rural character of this small town, pose substantial financial burdens on the town for police, fire, sewer, and road service, and open the way for the tides of weekend 'visitors' who would own second homes." 469 F.2d 956, 961.

stabilize growth and development trends in given areas merely because those trends have already begun. Admittedly, in the Prince's Point area of Yarmouth the trend in question is virtually completed, rather than just begun, but that fact alone does not undermine the reasonableness of the lot size restriction. As we have already stressed, we are not at liberty to substitute our judgment for that of the enacting body. As Chief Judge Coffin noted in Steel Hill Development, Inc. v. Town of Sanbornton, supra:

". . . a court does not sit as a super zoning board with power to act *de novo*, but rather has, in the absence of alleged racial or economic discrimination, a limited role of review." 469 F.2d 956, 960. (Footnote omitted)

■ Since the lot restriction in the Yarmouth ordinance is not unreasonable on its face, ". . . the objecting party must produce evidence to show that it is in fact unreasonable in its operation." Wright v. Michaud, supra, 200 A.2d at 550.

We have already considered and rejected appellant's claim that the 30,000 square feet requirement in the Yarmouth ordinance is invalid because the majority of lots in the Prince's Point section of the "R-A" zone do not conform to the requirement.

■ For the same reasons, we also reject her related claim that the denial of her request for a variance was somehow rendered improper by the existence of numerous nonconforming lots in Prince's Point. We approve the rule applicable to this factual situation which was succinctly stated in Casper v. City of Long Branch et al., 18 N.J.Super. 90, 86 A.2d 691, 692 (1952):

". . . it is established that the existence of non-conforming uses in a rela-

tively small portion of the area does not prove that the refusal to permit another is in any real sense arbitrary or unreasonable."

We are not persuaded that denial of the variance was unreasonable when we view appellant's lot in isolation.

■ Despite appellant's efforts to depict her property as *two* lots, rather than one, (based upon the divided ownership of the land in earlier years), we agree with the determination of the presiding Justice that appellant is the owner of a single, large lot, upon which she wishes to build a second dwelling. As such, she does not qualify for the "Buildings on small lots" exception from the lot size restriction as provided in Article XII(1)(a) of the ordinance.[7]

■ We also reject the contention that the variance ought to have been granted since, even if divided, the resulting lots would exceed 20,000 square feet and therefore meet the minimum lot size requirement for rural residential buildings contained in 12 M.R.S.A. § 4807-A. That section states in part that:

"In all areas of the State, notwithstanding any other provision of state or local law or regulation, no person shall:

*l.* Dispose of waste from any single family residential unit by means of subsurface waste disposal unless such lot of land on which such single family residential unit is located contains at least 20,000 square feet; . . . "

Without attempting an analysis of the statutory history of this section, we are satisfied that it was enacted to assure the maintenance of health and sanitation standards with respect to waste disposal, rather than to abrogate, by implication, the

---

7. "*l. Buildings on small lots*
   a. A dwelling may be erected on a lot smaller than that required by this Ordinance provided that, at the time of enactment of this Ordinance, the lot:

i. was owned separately from all adjoining lots . . . .."

zoning powers conferred upon municipalities elsewhere in the laws.

Because of this narrow focus on health and sanitation, as distinguished from the numerous other community interests served by the minimum lot requirement in the Yarmouth zoning ordinance, we do not consider the 20,000 square feet restriction in Section 4807–A to be of controlling significance in this case.

▋ Appellant contends that the Board of Zoning Appeals denied her request for a variance without guidance by appropriate standards. As support for this contention, she cites this Court's decision in Waterville Hotel Corp. v. Board of Zoning Appeals, Me., 241 A.2d 50 (1968), in which we held *inter alia,* that a legislative body

" . . . cannot give the [Zoning] Board discretionary authority to approve or disapprove applications for permits as the Board thinks best serves the public interest without establishing standards to limit and guide the Board." 241 A.2d at 52.

In *Waterville Hotel,* the applicant had been denied a building permit *after* meeting all of the technical requirements of the zoning ordinance. The Waterville Board of Appeals thus exercised a discretion which, although conferred by the zoning ordinance, was *not attached to* specific standards in the ordinance. Our concern in disapproving this practice was that by acting without such standards, a zoning board would be engaging in " . . . ad hoc, unplanned, and potentially arbitrary zoning," or, in effect "lot-by-lot zoning." *Id.* at 54. See also, Stucki v. Plavin, Me., 291 A.2d 508 (1972).

In the case at bar, the standard employed by both the building inspector and the Board of Appeals in denying the appellant's *permit* was clearly and precisely stated in the ordinance. The Board's determination that appellant's property did not qualify under that precise standard, *viz.,* 30,000 square feet, did not involve that unregulated discretion of which we spoke in *Waterville Hotel,* since the legislative body had clearly defined the parameters within which the Board was to operate.

It is true that the standards employed by the Board of Appeals in reaching its decision to deny the variance are less precise and objectifiable than the 30,000 square feet standard which defines a permitted use. Article XV, (2)(a)(2) of the Yarmouth Ordinance provides that the Board shall have the power

" . . . to grant variances from the terms of the Ordinance . . . where necessary to avoid undue hardship, provided there is no substantial departure from the intent of the Ordinances;"[8]

We are nonetheless satisfied that this broadly stated criterion is sufficient to guide the Board in granting or denying variances, and to notify applicants of the burdens accompanying any demand for a variance.

▋ In its order sustaining the Board of Zoning Appeals decision, the Court below specifically considered whether "undue hardship" had been shown to result from denial of the variance.

Its conclusion was that:

" . . . no variance could be granted by the Board because of a complete ab-

---

8. The actual power to grant variances is directly conferred upon municipal zoning appeals boards by statute. The Yarmouth ordinance merely incorporates language employed in 30 M.R.S.A. § 4954. Sec. 4954 was replaced by 30 M.R.S.A. § 4963, enacted in Sec. 3, c. 455, P.L.1971. Sec. 4963(3) now states that:

"A variance may be granted by the board only where strict application of the ordinance, or a provision thereof, to the petitioner and his property would cause undue hardship or would not be in the best interest of the community."

sence of 'undue hardship.' The Court is not unaware that as demand for shore-front property grows, and as evaluation and thus taxes increase, there will be an increasing desireability of utilizing seemingly excess land. However, these pressures fall short of the showing of undue hardship required of the plaintiff. The very purpose of the lot size requirement is to prevent economic pressures from causing overcrowded development."

██ We cannot disagree with these conclusions, based upon the concept of "undue hardship" which we first adopted in Lovely v. Zoning Board of Appeals of Presque Isle, Me., 259 A.2d 666 (1969), and again applied as recently as a month ago in Lippoth v. Zoning Board of Appeals of South Portland, Me., 311 A.2d 552 (1973):

" 'Before the Board may exercise its discretion and grant a variance upon the ground of unnecessary hardship, the record must show that (1) the land in question cannot yield a reasonable return if used only for a purpose allowed in that zone; (2) that the plight of the owner is due to unique circumstances and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself; and (3) that the use to be authorized by the variance will not alter the essential character of the locality.' " *Id.* at 556.

It would be unfair to say that the granting of a variance to appellant would "alter the essential character of the locality."

However, we cannot say that appellant's "plight" is "due to unique circumstances," or that the denial of the requested variance will render her property incapable of yielding a reasonable return.

In so ruling we again emphasize that appellant is the owner of a single lot. A dwelling house stands on the lot, and neither this holding nor the Yarmouth ordinance prevents appellant from enjoying full occupation and use of that house.

The only "uniqueness" attaching to appellant's property is its size in relation to other parcels in the immediate area. This difference cannot alone support a finding of hardship where, as we have noted, appellant is not denied the normal use of the land, and where the very purpose of the challenged ordinance restriction is prevention of that which appellant proposes—the partitioning of an existing plot in order to accommodate another building.

Admittedly, denial of the variance will have the effect of barring appellant from *increasing* the value of the land by placing another dwelling upon it. That circumstance does not, however, render the entire parcel unmarketable. In order for her land to "yield a reasonable return," appellant need not be accorded every conceivable opportunity to *maximize* her return, or potential return, in derogation of a duly enacted and legitimate zoning ordinance.

The hardship of which appellant complains falls far short of that required to assure that variances "not be easily or lightly granted" and that they "be the exception and not the rule." Lovely v. Zoning Board of Appeals of Presque Isle, supra, 259 A.2d at 670.

In addition to our determination that the minimum lot restriction embodied in the Yarmouth zoning ordinance is neither unreasonable nor unconstitutional on its face, nor as applied in appellant's case, we must also find that appellant failed to sustain her burden of showing that she will suffer undue hardship unless the variance is granted.

The Superior Court acted correctly by affirming the decision of the Yarmouth Board of Zoning Appeals.

The entry must be,

Appeal denied.

WEBBER, J., sat at argument but retired before this opinion was adopted.

All Justices concurring.