MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 3
Docket:      Cum-16-43
Argued:      October 27, 2016
Decided:     January 5, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.
Majority:    SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HJELM, JJ.
Dissent:     ALEXANDER, J.

21 SEABRAN, LLC

v.

TOWN OF NAPLES

MEAD, J.

[¶1]  21 Seabran, LLC, appeals from a judgment entered in the Superior Court (Cumberland County, *Cole, C.J.*) pursuant to M.R. Civ. P. 80B following a hearing affirming a decision of the Town of Naples Board of Appeals.  The Board denied 21 Seabran's appeal from the Town of Naples Code Enforcement Officer's denial of two permits necessary to renovate a garage on a lakefront parcel based on its conclusion that the parcel would have insufficient shore frontage to comply with state and local law.  21 Seabran argues that the Board erroneously concluded that the proposed renovation would add to the parcel a second "residential dwelling unit," as defined by the Town of Naples Shoreland Zoning Ordinance, and that the Board misapplied applicable state authority to

2

reach its conclusion that the renovation would render the parcel noncompliant. We agree and vacate the judgment.

## I. BACKGROUND

[¶2] 21 Seabran, LLC, owns a parcel of property on Brandy Pond in Naples. The parcel has about 200 feet of shore frontage, and is currently improved with a three-bedroom single-family home and a thirty-foot by forty-foot detached garage, both of which are in the shoreland zone.

[¶3] In September 2014, Mills Whitaker Architects of Arlington, Massachusetts, submitted applications to the Town of Naples Code Enforcement Officer (CEO) on behalf of 21 Seabran for a building permit and a subsurface wastewater disposal system permit in connection with a proposed renovation to the second floor of the detached garage (the proposed structure). The proposed structure, which 21 Seabran had described as a "bunkhouse," was to consist of three bedrooms, two bathrooms, a sitting room, a washer and dryer, and storage closets; the estimated cost of the project was $100,000. 21 Seabran also proposed adding a new, separate septic system with a design flow of 270 gallons per day (gpd) to serve the proposed structure. The CEO declined to act on the permits because she found that the proposed structure did not fit within the definition of a bunkhouse in the State of Maine Subsurface

Wastewater Disposal Rules (SWDR).[1]

[¶4]   Soon thereafter, Mills Whitaker Architects submitted to the CEO amended building and wastewater disposal system permit applications on behalf of 21 Seabran.   The floor plan of the proposed structure remained unchanged, but the use of the proposed structure was changed on the building permit application from a bunkhouse to "3 accessory [bedrooms] and 2 baths on second floor of existing garage."

[¶5]  In a letter dated November 17, 2014, the CEO denied the amended permit applications based on her determination that the proposed structure constituted a "dwelling unit" and her conclusion that the parcel lacked the lot area and shore frontage required to serve two "dwelling units"—the proposed structure and the existing residence—by the Town of Naples Shoreland Zoning Ordinance (SZO), Naples, Me., Shoreland Zoning Ordinance § 15(A) (June 4, 2014); the State of Maine Minimum Lot Size Law, 12 M.R.S. § 4807-A (2015); and Minimum Lot Size Rules, 16 C.M.R. 10 144 243-2 § 1001.1 (2005).[2]

---

[1] The State of Maine Subsurface Wastewater Disposal Rules (SWDR) defines a "bunkhouse" as "[a] detached bedroom having no plumbing; accessory to a single family dwelling for the temporary accommodations of guests of the property owner while the owner is an occupant of the principal dwelling."  16 C.M.R. 10 144 241-64 § 14 (2015).  The most recent amendments to the SWDR, which became effective during the pendency of this case, do not affect the definitions applicable to this matter.

[2] Aside from use of its definitional provisions, applicable provisions of the SWDR are not at issue in this appeal.

4

[¶6]  21 Seabran filed an administrative appeal with the Town of Naples Board of Appeals regarding the denial of both permits.  At a public hearing held by the Board on February 24, 2015, 21 Seabran argued that there is no plan for a kitchen in the proposed structure, and it was not a separate residential dwelling unit.[3]  The CEO argued that neither the Minimum Lot Size Rules nor the SWDR definitions of a "dwelling unit" or "single family residential unit" include a requirement that a structure contain a kitchen, and although there are currently no plans for a kitchen in the proposed structure, someone could potentially set up a hot plate or microwave oven and those items would not appear on a floor plan.

[¶7]  The Board voted 3-0 to deny the appeal.  In its March 3, 2015, written decision, the Board agreed with the CEO that the proposed structure is a dwelling unit, reasoning that "Maine Supreme Court cases involving the definition of a 'dwelling unit' . . . make it clear that municipal administrative boards are allowed to use their common sense in their interpretation of what specific facts fit the definition of a dwelling unit." Citing the SZO, which requires that a parcel have 200 feet of shore frontage for each residential dwelling unit

---

[3]  As will be discussed *infra*, the Town's ordinance defines a "residential dwelling unit" as a structure that contains "cooking, sleeping and toilet facilities."  Naples, Me., Definitional Ordinance (June 16, 2010).

on the property, the Board determined that the parcel "needs at least 400 feet of shore frontage (200 feet for every 300 gpd of wastewater) in order to comply with the Minimum Lot Size Law and Rules." The Board concluded that because the parcel did not have that much frontage, the CEO properly denied 21 Seabran's permit applications.

[¶8]  21 Seabran appealed to the Superior Court pursuant to M.R. Civ. P. 80B. Following a hearing on November 30, 2015, the court affirmed the Board's decision. The court gave deference to the Board's determination that the proposed structure was a residential dwelling unit pursuant to the SZO and agreed with its conclusion that the property must have 400 feet of frontage to comply with the SZO. This appeal followed. *See* M.R. Civ. P. 80B(n); M.R. App. P. 2.

## II. DISCUSSION

[¶9]  "In a Rule 80B appeal, the Superior Court acts in an appellate capacity, and, therefore, we review the agency's decision directly." *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293. In this case, "we review the decision of the Board rather than that of the CEO, because . . . the Board heard evidence and conducted a de novo review, and the [SZO] did not explicitly limit that capacity, and therefore the Board acted as fact-finder and decision-maker."

6

*Rudolph v. Golick*, 2010 ME 106, ¶ 7, 8 A.3d 684 (quotation marks and citation omitted); *see* Naples, Me., Shoreland Zoning Ordinance § 16(F)(3).

[¶10]   We review the Board's decision "for error of law, abuse of discretion or findings not supported by substantial evidence in the record." *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024 (quotation marks omitted).  "Substantial evidence exists if there is any competent evidence in the record to support a decision."  *Fitanides v. City of Saco*, 2004 ME 32, ¶ 23, 843 A.2d 8 (quotation marks omitted).   21 Seabran bears the burden of persuasion on appeal because it seeks to overturn the Board's decision. *See Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048.

A.      Whether the Proposed Structure is a "Residential Dwelling Unit"
        Pursuant to the SZO

[¶11]  21 Seabran argues that the Board improperly determined that the proposed structure was a "residential dwelling unit" pursuant to the zoning ordinance because the Board did not apply the language of the SZO, which expressly requires that a residential dwelling unit contain cooking facilities, and instead used a "common sense" approach to determine what constitutes a residential dwelling unit.

[¶12]   We review the interpretation of a local ordinance de novo as a question of law.  *Aydelott*, 2010 ME 25, ¶ 10, 990 A.2d 1024.  When we interpret

an ordinance, we look first to the plain meaning of its language, and if the meaning of the ordinance is clear, "we need not look beyond the words themselves." *Duffy v. Town of Berwick*, 2013 ME 105, ¶ 23, 82 A.3d 148 (quotation marks omitted). Additionally, if a term is specifically defined in an ordinance, we will not redefine it. *Rudolph*, 2010 ME 106, ¶ 9, 8 A.3d 684.

[¶13] The SZO provides that a lot must have at least 60,000 square feet of area and 200 feet of shore frontage per residential dwelling unit. Naples, Me., Shoreland Zoning Ordinance § 15(A), (A)(4). In the Town of Naples Definitional Ordinance, a "residential dwelling unit" is defined as follows:

> A room or group of rooms designed and equipped exclusively for use as permanent, seasonal, or temporary living quarters for only one family at a time, and *containing cooking, sleeping and toilet facilities*. The term shall include mobile homes and rental units that contain cooking, sleeping, and toilet facilities regardless of the time period. Recreational vehicles are not residential dwelling units.

Naples, Me., Definitional Ordinance (June 16, 2010) (emphasis added).

[¶14] Looking to the plain language of the definition of a residential dwelling unit, its meaning is clear: a structure must contain cooking facilities, in addition to sleeping and toilet facilities, to constitute a residential dwelling unit pursuant to the SZO.

[¶15] In determining that the proposed structure constituted a residential dwelling unit, the Board made no finding that the proposed

8

structure contained cooking facilities, and we cannot ignore the plain language of the SZO definition when determining whether the Board erred in applying the ordinance. *See Hartwell v. Town of Ogunquit*, 2015 ME 51, ¶ 11, 115 A.3d 81 ("[W]e do not have the authority to ignore the plain language of [a Town]'s Zoning Ordinance."). In the absence of any finding that the proposed structure contained cooking facilities, we conclude that the Board's determination that it was a residential dwelling unit for purposes of the SZO was erroneous.[4] Accordingly, the provision of the SZO which requires 200 feet of shore frontage for a residential dwelling unit does not apply to the proposed structure.[5]

B.     Compliance with the Minimum Lot Size Law and Rules

[¶16]   Based on its determination that the proposed structure was a residential dwelling unit pursuant to the SZO, the Board concluded that the parcel "needs at least 400 feet of shore frontage (200 feet for every 300 gpd of

---

[4] We recognize that in some cases we have afforded municipalities flexibility in determining what constitutes a residential dwelling unit and have affirmed determinations that a structure is a dwelling unit even in the absence of cooking facilities. *See, e.g.*, *Goldman v. Town of Lovell*, 592 A.2d 165, 169 (Me. 1991); *Wickenden v. Luboshutz*, 401 A.2d 995, 996-97 (Me. 1979). However, those cases are markedly different from the case at bar because those local ordinances utilized broad definitions of what constituted a dwelling unit that did not contain an express requirement that such a structure contain cooking facilities. *See Goldman*, 592 A.2d at 167 n.3; *Wickenden*, 401 A.2d at 996 & n.2.

[5] The parties dispute whether the proposed structure could instead be considered an "accessory structure" pursuant to the SZO if it was not a residential dwelling unit, but the Board made no findings on this issue and we need not reach it here. The SZO does not prescribe frontage requirements for accessory structures. Naples, Me., Shoreland Zoning Ordinance § 15(B)(1) (June 4, 2014). Regardless of whether the proposed structure meets the SZO's definition of an accessory structure, it does not constitute a residential dwelling unit pursuant to the SZO.

wastewater) in order to comply with the Minimum Lot Size Law and Rules." 21 Seabran contends that the Board's conclusion is erroneous because it improperly incorporated the SZO frontage requirement for a residential dwelling unit into the applicable Minimum Lot Size Rule to determine that the parcel has insufficient frontage.

[¶17]  "To interpret a statute and its implementing regulations, we look first to the plain meaning of the language used."  *Smith v. Cent. Me. Power Co.*, 2010 ME 9, ¶ 18, 988 A.2d 968.  Interpreting a statute's plain language involves considering its subject matter and purposes, and the consequences of a certain interpretation.  *Sabina v. JPMorgan Chase Bank, N.A.*, 2016 ME 141, ¶ 6, --- A.3d ---.

[¶18]  The Board correctly relied on the definition of a "single family residential unit" set forth in the Minimum Lot Size Law and Minimum Lot Size Rules, which both define the term as "any structure of any kind . . . used or designed to house a single family, and shall include those structures used permanently and seasonally."[6]   12 M.R.S. § 4807(4) (2015); 16 C.M.R. 10 144 243-1 § 1(H) (2005).

---

[6]  The Board also cited the SWDR definition of a "dwelling unit," which is "[a]ny structure or portion of a structure, permanent or temporary in nature, used or proposed to be used as a residence seasonally or throughout the year."  16 C.M.R. 10 144 241-65 § 14.

10

[¶19]   With regard to minimum lot requirements for a single family residential unit, the Minimum Lot Size Law provides:

[N]o person shall:

> 1. Dispose of waste from any single family residential unit by means of subsurface waste disposal unless such lot of land on which such single family residential unit is located contains at least 20,000 square feet; and if the lot abuts a lake, pond, stream, river or tidal area, it shall further have a minimum frontage of 100 feet on such body of water[.]

12 M.R.S. § 4807-A(1).

[¶20]   The Minimum Lot Size Rules govern the administration of the Minimum Lot Size Law.  16 C.M.R. 10 144 243-1 § 1000.1 (2005).  The specific section of the Rules at issue here is section 1001.0, which addresses the limited subject of lot requirements in the context of subsurface wastewater disposal systems.  It provides:

**Section 1001.0  Minimum Lot Size and Frontage Requirements**

**1001.1**  Minimum requirements: No person shall dispose of wastewater by means of a subsurface wastewater disposal system, unless the lot meets the minimum lot size and frontage requirements in this Code.

**1001.1.1**  Single-family dwelling units: A lot on which a single-family dwelling unit is located shall contain at least 20,000 square feet.  If the lot abuts a lake, pond, stream, river, or tidal area, it shall have a minimum frontage of 100 feet on the water body and any greater frontage required by local zoning.  For purposes of this Code, a single-family residential unit shall be determined to be

300 gallons per day of wastewater.

**1001.1.2** Other land use activities: Other land uses that generate wastewater shall require a lot containing at least 20,000 square feet and 100 feet of frontage for every 300 gallons per day of wastewater generated by the use. For wastewater generated in excess of 300 gallons per day the lot shall be in the proportion of 20,000 square feet and 100 feet of frontage for every 300 gallons per day. Determine the minimum lot size and frontage required based on the requirements in this Section.

**1001.1.2.1** Multiple unit housing: For multiple unit housing, calculate the daily wastewater flows based on 120 gallons per bedroom per day.

**1001.1.2.2** Other new land uses: For other new land use activities, calculate the daily wastewater flows based on the design flow requirements prescribed in Table 1.

**1001.1.2.3** Other existing land uses: For other existing land use activities, calculate the daily wastewater flows based on the design flow requirements prescribed in Table 1 or actual water meter readings as set forth in Section 1002.0.

16 C.M.R. 10 144 243-2 § 1001.0 (2005).

[¶21] The Town assumes that the requirement in Rule 1001.1.1 that a parcel containing a single family residential unit have 100 feet of frontage plus "any greater frontage required by local zoning" effectively incorporates any local zoning frontage requirement, regardless of whether that requirement was based upon subsurface wastewater disposal concerns or not, into the Rule, meaning that if a structure was a residential dwelling unit pursuant to the SZO,

12

it would require 200 feet of frontage, rather than 100 feet of frontage, to be in compliance with Rule 1001.1.1.

[¶22]  The plain language of Rule 1001.1.1 requires a parcel containing a single family residential unit to have a minimum of 100 feet of shore frontage. The reference in Rule 1001.1.1 that incorporates greater frontage requirements from a local ordinance clearly envisions deference to local ordinance frontage requirements only to the extent that the ordinance establishes greater frontage requirements specifically in relation to gallons per day of wastewater generated—not other purposes that local ordinances may address for objectives such as aesthetics or continuity of neighborhoods.  It is incongruous to suggest that the Rule, which is concerned only with subsurface wastewater disposal systems, would increase its required frontage based on frontage requirements in an ordinance that are premised upon unrelated factors.

[¶23]  The Town of Naples SZO does not establish frontage requirements based upon subsurface wastewater disposal systems.  As such, the 100-foot frontage requirement established by Rule 1001.1.1 governs compliance with the Rule.  If the SZO did establish frontage requirements based upon subsurface wastewater disposal systems, the second sentence in Rule 1001.1.1—which the

Town's reading would render utter surplusage—provides the benchmark for determining whether the SZO actually did provide for greater frontage based upon gallons per day of usage. Without this benchmark, it would be impossible to determine whether a local ordinance frontage requirement based on wastewater generated did, in fact, exceed the Rule's requirement of 100 feet of frontage per 300 gallons per day of usage.

[¶24]  This reading of Rule 1001.1.1 is consistent with the immediately following provision of the Minimum Lot Size Rules which expressly bases frontage on wastewater generation. Rule 1001.1.2 directs that "[o]ther land uses that generate wastewater" require 100 feet of shore frontage for every 300 gallons per day of wastewater generated, and if the use generates more than 300 gallons per day, the amount of necessary frontage becomes proportional to the wastewater generated. 16 C.M.R. 10 144 243-2 § 1001.1.2.

[¶25]  Moreover, this reading is consistent with the purpose of the Minimum Lot Size Rules, which is to "provide minimum State requirements for minimum lot sizes for developments using onsite subsurface wastewater disposal to assure environmental sanitation and safety." 16 C.M.R. 10 144 243 (2005) (Basis Statement for Minimum Lot Size Rules). We have explained that the Minimum Lot Size Law, which the Rules interpret, "was

14

enacted to assure the maintenance of health and sanitation standards with respect to waste disposal, rather than to abrogate, by implication, the zoning powers conferred upon municipalities elsewhere in the laws." *Barnard v. Zoning Bd. of Appeals of Yarmouth*, 313 A.2d 741, 747-48 (Me. 1974). We distinguished "this narrow focus on health and sanitation . . . from the numerous other community interests served by [a] minimum lot requirement" in a local zoning ordinance. *Id.* at 748. It would be incongruous to import simply *any* local frontage requirement into Rule 1001.1.1 because that local ordinance may serve a purpose entirely different from the health and sanitation purposes served by Rule 1001.1.1.

[¶26] In conclusion, because the SZO requirement that a residential dwelling unit have 200 feet of frontage is not based on gallons per day of wastewater generated, it is not incorporated into Rule 1001.1.1.[7] Therefore, the Board's conclusion that 21 Seabran's parcel needed 200 feet of frontage for every 300 gallons per day of wastewater was erroneous.

---

[7] Of course, the parcel must still comply with the provisions of the Town's SZO. To comply, the existing residence, as a residential dwelling unit, would require 200 feet of frontage, but the proposed structure would require no frontage because it is not a residential dwelling unit pursuant to the SZO.

The entry is:

> Judgment vacated. Remanded to the Superior Court with instructions to remand to the Town of Naples Board of Appeals for further proceedings consistent with this opinion.

_____

ALEXANDER, J., dissenting.

[¶27] I respectfully dissent.

[¶28] 21 Seabran, LLC began this proceeding before the Town of Naples by attempting to convince the Town that it was applying for a permit to convert the second floor of its garage into a "bunkhouse," the legal definition for which was "a detached bedroom" with no plumbing and a waste discharge design flow of 20 gallons per day per bed. The Town Code Enforcement Officer was not misled by the "bunkhouse" claim and refused to process 21 Seabran's application.

[¶29] 21 Seabran then resubmitted its application, identical to the first application except for the term "bunkhouse" being omitted. That application sought to convert the second floor of the garage into three bedrooms, two full bathrooms, a separate sitting room, and a washer-dryer connection supported by a wastewater disposal system with a design flow of 270 gallons per day. As the trial court's opinion points out, the application included no provision for

16

cooking facilities or equipment. But portable equipment, such as a refrigerator and a microwave, would have been easy to add without notice to the Town and would have been important to accommodate visiting families. Further, the washer-dryer connection, with minimal adjustment, could have accommodated a sink and a cook stove.

[¶30] The Town's Definitional Ordinance defines a "dwelling" as "living quarters for only one family, including provisions for living, cooking and eating." Naples, Me., Definitional Ordinance (June 16, 2010). That same ordinance defines a "residential dwelling unit" as "living quarters for only one family at a time, and containing cooking, sleeping and toilet facilities." *Id*.

[¶31] The focus of 21 Seabran's presentation before the Board of Appeals was its effort to prove that its renovation would not turn its garage into a "residential dwelling unit." However, nothing in 21 Seabran's application specifically excluded or committed to permanent exclusion of portable or installed cooking equipment. The application only avoided any mention of installation of cooking equipment. The Town's brief notes, "It will be very difficult to monitor the use of cooking facilities in the Disputed Structure after-the-fact."

[¶32]  On appeal, the party seeking to vacate a state or local agency decision—here 21 Seabran—bears the burden of persuasion to demonstrate error.  *Rossignol v. Me. Pub. Emps. Ret. Sys.*, 2016 ME 115, ¶ 6, 144 A.3d 1175; *Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048.

[¶33]  21 Seabran had the burden of proof to demonstrate that its three bedroom, two bath renovation was not creating a residential dwelling unit, but some lesser structure that could avoid the minimum shore frontage requirement.  When an appellant had the burden of proof before an agency, and challenges an agency finding that it failed to meet that burden of proof, a court will not overturn the agency fact-finding unless the appellant demonstrates that the administrative record compels the contrary findings that the appellant asserts should have been entered.  *Kelley v. Me. Pub. Employees Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676 (stating that the Court will reverse a finding of failure to meet a burden of proof "only if the record compels a contrary conclusion to the exclusion of any other inference"); *Quiland, Inc. v. Wells Sanitary Dist.*, 2006 ME 113, ¶ 16, 905 A.2d 806.

[¶34]  In our review on appeal, the agency is accorded the capacity to disbelieve evidence supporting an applicant with the burden of proof or to assign that evidence lesser weight than contrary evidence.  *See Anderson v. Me.*

*Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 27, 985 A.2d 501. A judicial or administrative fact-finder has the capacity to disbelieve evidence supporting a party with the burden of proof, even if no contrary evidence is offered. *See In re Fleming,* 431 A.2d 616, 618 (Me. 1981).

[¶35] Given the misleading manner in which the 21 Seabran application process was initiated, the very substantial residential dwelling unit that the renovation appeared to create, and the lack of any firm commitment to never add provision for cooking and eating to the structure, the Town of Naples Board of Appeals, looking at the reality of the application and applying their common sense, could reasonably find that the application was indeed one for a residential dwelling unit that did not meet the minimum shore frontage requirements. The Board of Appeals was not compelled to find that the application was for some lesser type of dwelling unit that did not create a minimum shore frontage problem. The Superior Court, applying the deferential standard of review it was required to apply to the Board's fact-findings, properly affirmed the Board's decision.

[¶36] I would affirm the Superior Court's judgment.

David A. Goldman, Esq. (orally), Norman, Hanson & Detroy, LLC, Portland, for appellant 21 Seabran, LLC

Sally J. Daggett, Esq. (orally), Jensen Baird Gardner & Henry, Portland, for appellee Town of Naples

Cumberland County Superior Court docket number AP-2015-9
FOR CLERK REFERENCE ONLY