STATE OF MAINE                          BUSINESS & CONSUMER DOCKET
PORTLAND, ss.                           DOCKET NO. BCD-APP-2021-05


ELIZABETH MILLS,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )    ORDER ON RULE 80B APPEAL
                                   )
TOWN OF BAR HARBOR and             )
BHAPTS, LLC,                       )
                                   )
          Defendants.              )


Pending before the Court is the Complaint for Review of Governmental Action pursuant to M.R. Civ. P. 80B brought by Plaintiff Elizabeth Mills ("Mills"). The Court heard oral argument on the Complaint on April 29, 2021. Participating in the oral argument was attorney Arthur Greif, Esq. for Mills,[1] and attorneys P. Andrew Hamilton, Esq. and Patrick Lyons, Esq., for Defendant BHAPTS, LLC ("BHAPTS"). Attorney Edmond Bearor appeared on behalf of Defendant Town of Bar Harbor (the "Town"), but apart from noting that the Town's position is reflected in the decisions of its Planning Board, attorney Bearor did not participate in oral argument. The Town did not file a brief in the appeal. As discussed below, the Court affirms the Planning Board on all but one issue—undue adverse effect on historic sites in the area.

## BACKGROUND

BHAPTS owns and operates a 1.54 acre property located at 25 West Street Extension, Bar Harbor, Maine. In 1986, the property was developed (by a prior owner) as sixteen multifamily units, consisting of four buildings, each containing four units. The units are used for workforce

---

[1] Although attorney Greif appears here only on behalf of Mills, he participated in proceedings before the Town on his own behalf as well.

1

housing, by employees performing seasonal employment in the area. Mills is Trustee of the Collier Family Trust (the "Trust"). The Trust owns property located at 15 Highbrook Rd., Bar Harbor, Maine. Mills resides during a part of the year at the Trust property. The Trust property abuts the northeast property line of BHAPTS's property.

BHAPTS's property is located in the Town's Village Residential zoning district. On or about December 21, 2017, BHAPTS submitted a permit application to the Town for Planned Unit Development—Village ("PUD-V") approval of a project on its 25 West Street Extension property (the "Project"). The application was denominated PUD-2017-02 Planned Unit Development—Village. The Project proposed to renovate and reconfigure the existing buildings on the property, and construct new buildings with additional dwelling units. The application went through extensive Town review and public hearings. As a result, the initial site plan for the project was revised. By decision dated January 16, 2019 and signed February 6, 2019 (the "February 6, 2019 Decision"), the Town's Planning Board approved BHAPTS's permit application.

Mills appealed the Planning Board's decision to the Town's Board of Appeals, and then to Superior Court. The determination was ultimately remanded back to the Planning Board. In response to issues raised on remand, BHAPTS submitted a further revised site plan in support of its application. The reconfigured site plan reduces vehicle access, clusters buildings, increases open space, increases some buffers, incorporates principles of the Great American Neighborhood, and makes it easier for pedestrians to move about the site. The revised site plan also provides for a pedestrian staircase connecting the Project to Woodbury Road. Woodbury Road is an unpaved street commonly used by pedestrians and cyclists. The revised site plan went through further Planning Board review. By decision dated April 29, 2020 and signed May 8, 2020 (the "May 8, 2020 Decision"), the Planning Board approved BHAPTS's revised permit application.

2

As currently proposed and approved, the existing four buildings on the property (Buildings A through D) will be renovated and reconfigured from four dwelling units each, to two dwelling units each, for a total of eight dwelling units. Three new buildings will be constructed on the property (Buildings E, F & G). Buildings E and F will be two and half stories tall and contain three dwelling units each, for a total of six dwelling units. Building G will be two stories tall and have two dwelling units. Buildings F & G will be situated along the property's northeast property line. Each of the dwelling units includes a kitchen, bathrooms, living space, and bedrooms. When completed, the Project will have sixteen total dwelling units (the same number as currently exist, but reconfigured into seven buildings as described above). Three of the sixteen dwelling units will be affordable housing units.

## STANDARD OF REVIEW

The parties agree that the operative decisions on appeal are the decisions of the Planning Board signed February 6, 2019 and May 8, 2020. *See Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 4, 757 A.2d 773 (where the Board of Appeals acts only in an appellate capacity, the Court reviews the decision of the Planning Board directly). In general, the decisions of a Planning Board are reviewed for error of law, abuse of discretion, or findings not supported by substantial evidence in the record. *Aydelott v. City of Portland*, 2010 ME 25, ¶ 10, 990 A.2d 1024 (quotation omitted). Here, Mills argues that the Planning Board made eight errors of law, and that three of its findings are not supported by substantial evidence.[2] As the party seeking to overturn the Board's decisions, Mills bears the burden of persuasion. *Friends of Lamoine v. Town of Lamoine*, 2020 ME 70, ¶ 20, 234 A.3d 214.

---

[2] At oral argument BHAPTS announced that it was no longer pursuing any defense that Mills waived certain claims of error, and asked the Court to substantively decide all eleven arguments (eight of law, three of evidence) raised by Mills in her appeal. The three evidence-based arguments apply only to the discussions of residents, family, and pedestrian easements.

The eight errors of law asserted by Mills all revolve around interpretation of the Land Use Ordinance of the Town of Bar Harbor, Maine (the "LUO"). The interpretation of a municipal ordinance is a question of law subject to de novo review. *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8, 905 A.2d 293. "Although the terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole," courts must first look first to the plain language of the provisions to be interpreted. *Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶ 22, 868 A.2d 161 (quotations omitted). If the meaning of the ordinance is clear, the court will look no further than its plain meaning. *21 Seabran, LLC v. Town of Naples*, 2017 ME 3, ¶ 12, 153 A.3d 113. In reviewing the local agency's application of an ordinance, the court accords substantial deference to an agency's characterizations and fact-findings as to what meets the ordinance's standards. *Fissmer v. Town of Cape Elizabeth*, 2017 ME 195, ¶ 13, 170 A.3d 797.

Substantial evidence exists if there is any competent evidence in the record upon which a reasonable mind would rely as sufficient support for a conclusion. *21 Seabran, LLC v. Town of Naples*, 2017 ME 3, ¶ 10, 153 A.3d 113. A board's finding is not unsupported by substantial evidence simply because two inconsistent conclusions can be drawn from the evidence. *Friends of Lamoine*, 2020 ME 70, ¶ 21, 234 A.3d. The fact that the record before the board is inconsistent also does not mean the board's decision is unsupported. *Duffy v. Town of Berwick*, 2013 ME 105, ¶ 22, 82 A.3d 148. However, a court generally will not imply findings nor embark on an original inquiry. *Appletree Cottage, LLC v. Town of Cape Elizabeth*, 2017 ME 177, ¶ 9, 169 A.3d 396.

## ANALYSIS

Mills' claims of error and lack of evidence will be taken up in the order as presented by Mills in her brief. However, it is difficult to follow Mills' arguments because she does not

explicitly tie her arguments to specific findings or conclusions in either of the February 6, 2019 or May 8, 2020 Decisions.[3] The Planning Board's decisions are lengthy, especially the February 6, 2019 order, and it is not easily discernable which arguments tie to which findings and conclusions. The Court has done its best to connect the dots, but the burden was on Mills to clearly and specifically identify which findings and conclusions she is challenging. To the extent she has failed to draw the Court's attention to a specific finding and conclusion, she has waived her appeal of that finding and conclusion.

1. **<u>This Use is Not Permitted in a Residential District.</u>**

Mills seems to be directing her first argument to Section 2(a) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

> The Board finds the use, Multifamily II, is allowed by Planned Use Development in the Village Residential district per section 125-20 E. of the Bar Harbor Land Use Ordinance.

Mills claims that the Planning Board erred as a matter of law, and that the Planning Board's finding is unsupported by substantial evidence.

Section 125-20 of the LUO creates the Village Residential District, and sets forth various standards, uses, and other guidance pertaining to the Village Residential District. Subsection 125-20(E) sets forth "Uses allowed by planned use development." The subsection has one entry: "(1) Multifamily II." It is not clear what exactly Mills is contesting. Multifamily II is clearly a use allowed in the Village Residential District. Thus, the Planning Board did not err as a matter of law in determining that "the use, Multifamily II, is allowed by Planned Use Development in the Village Residential district per section 125-20 E."

---

[3] Compounding the difficulty is that BHAPTS's response brief does not conveniently track Mills' arguments.

To the extent Mills is arguing that the Project doesn't meet the definition of Multifamily II, that argument is similarly unavailing. Section 125-109 of the LUO defines "Dwelling, Multifamily II" as follows:

> A building or portion thereof, or multiple buildings, located on a lot or on a contiguous parcel or area of land, used for residential occupancy for five or more families living independently of each other and doing their own cooking in the building in each of five or more separate and independent dwelling units.

The Project easily meets this definition. The Project proposes sixteen dwelling units, spread across seven buildings, all on one lot. Each of the dwelling units contains a kitchen, bedrooms, living space, and bathrooms. The Project is obviously residential in nature and will accommodate five or more families living independently and each capable of doing their own cooking in their unit. The Planning Board did not err as a matter of law in treating the Project as "Multifamily II."

Mills objects by arguing the dictionary definitions of residents, residential, domicile, occupancy, and so forth. Mills' arguments are baseless, and to the extent they have any merit, the arguments pertain to compliance (i.e. code enforcement after the dwelling units are constructed and occupied), not site plan review. The Planning Board interpreted the LUO reasonably by considering BHAPTS's proposed dwelling units as residential, regardless of whether some of the likely occupants will only live in Bar Harbor seasonally (as does Mills herself), are members of the local workforce, hail from regions outside of the United States, or intend to set down long term roots in Bar Harbor. Mills' argument that the Project violates the purpose of the Village Residential District is also unpersuasive because the Village Residential District encompasses not only a diversity of living arrangements, but "nonintensive commercial uses" as well. LUO § 125-20(A) (June 12, 2018).

Mills also contends the Planning Board's finding is unsupported by substantial evidence. To the contrary, the site plans submitted to the Planning Board, including but not limited to the

6

detailed drawings showing the interior layout of the dwelling units, provides ample evidence that

the Project satisfies the Multifamily II definition, and that the proposed use is permitted in the

Village Residential District.

2. **These Workers Do Not Constitute a Family**

The Court interprets Mills' second argument to also challenge Section 2(a) of the Findings

and Conclusions of the Planning Board's February 6, 2019 Decision. As set forth above, that

section provides as follows:

> The Board finds the use, Multifamily II, is allowed by Planned Use Development
> in the Village Residential district per section 125-20 E. of the Bar Harbor Land Use
> Ordinance.

Mills claims that the Planning Board erred as a matter of law, and that the Planning Board's finding

is unsupported by substantial evidence.

It appears Mills is arguing that because she believes the future occupants of the Project's

dwelling units will not constitute a family as defined in the LUO, the Project does not qualify as

Multifamily II, and thus the use is not allowed in the Village Residential District. Section 125-

109 of the LUO defines "Family" as follows:

> Two or more persons related by blood, marriage, adoption or guardianship, or not
> more than five persons not so related, occupying a dwelling unit (including a
> vacation rental) and living as a single housekeeping unit, such a group to be
> distinguished from a group occupying a boardinghouse, lodging house, club,
> fraternity or transient accommodations.

Section 125-109 goes on to define "Transient" as "A person staying at a place that does not

constitute his or her home or usual dwelling unit for less than 30 days."

Although Mills is fearful about the future composition of the persons who will occupy the

dwelling units, those fears, to the extent they have any merit, pertain to compliance (i.e. code

enforcement after the dwelling units are constructed and occupied), not permitting. The Planning

7

Board interpreted the LUO reasonably by finding that BHAPTS's proposed dwelling units are designed to accommodate a family as defined by the LUO. The dwelling units have bedrooms, bathrooms, and living space organized around a kitchen. The interior layout and furnishings of the dwelling units are suitable for up to five persons living as a single housekeeping unit. Mills objects on the grounds that the occupants won't prepare their meals together, and the dwelling units are more akin to a boardinghouse or youth hostel. However, nothing about the plans submitted to the Planning Board suggests that is the case. The Planning Board did not err as a matter of law in its interpretation of "family" as applied to BHAPTS's Multifamily II Project.

Mills also contends the Planning Board's finding is unsupported by substantial evidence. Mills argues, for instance, that there is no evidence in the record that the occupants will be buying their food together. Such arguments do not merit lengthy response. The site plans submitted to the Planning Board, including but not limited to the detailed drawings showing the interior layout of the dwelling units, provides substantial evidence that the Project will accommodate families as contemplated by the LUO. The Planning Board's finding is supported by substantial evidence in the record.

### 3. Buffering

The Court interprets Mills' argument on buffering to challenge Section 2(h) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

> The Board finds that the development will meet the buffering and screening requirements as shown on exhibit 11.0b dated 01.08.2019.

Mills claims that the Planning Board's finding runs afoul of Section 125-69(S)(5), and thus erred as a matter of law. Section 125-69(S)(5) provides as follows:

The Planning Board may consider the allowance of multifamily dwellings not otherwise allowed in the underlying district when the construction of multifamily dwelling structures will result in the creation and/or retention of larger buffers, open space and recreation areas that might not be possible otherwise in the development, reduce negative impacts on the environment and will be consistent with the purpose and intent of this provision.

Mills argues that the Planning Board made an error of law because the increased density of the Project reduces—rather than increases—the amount of buffer along the property line abutting the Trust's property.

The Planning Board applied Section 125-69(S)(5) to the Project as a whole. By clustering buildings (a design revision suggested by and supported by the Planning Board), the Project increases overall open space and increases some buffers, even while decreasing other buffers—in this case the buffer between the Project and the property owned by Mills' Trust. The fatal flaw in Mills' argument is that it focuses only on the buffer that affects her. The language of Section 125-69(S)(5) does not require the Planning Board to ensure the buffer between every neighbor is increased, or even to focus on buffers to the exclusion of open space. Indeed, one of the expressed purposes of the PUD-V is to encourage the "[c]lustering of dwelling units." LUO § 125-69(s)(1)(a)[1] (June 13, 2006). The Planning Board did not err as a matter of law by applying its review pursuant to Section 125-69(S)(5) to the Project as a whole, not just to the buffer of interest to Mills.

4. **Open Space Requirement**.

The Court interprets Mills' argument on open space to challenge Section 4(e) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

The Board finds that the development meets the open space standard.

9

Mills argues the Planning Board erred as a matter of law, because the open space is not being used to support parks and gardens, and because BHAPTS did not propose open space language for incorporation into a deed or other recordable instruments.

The LUO's open space standard provides in relevant part as follows:

> (c)    Open Space
> [1]    All PUDs with an application parcel greater than five acres shall set aside by deed or easement an area in square footage at least 20% of the application parcel as open space.
> . . .
> [5]    Restrictive Language. The applicant shall present the Planning Board with proposed language for incorporation into deeds, recorded plans and declarations designed to ensure the integrity, protection and maintenance of the common open space. Such language shall be subject to the approval of the Town Attorney to be sure it will accomplish its intended purposes. The applicant will comply with all reasonable requests to the Town to incorporate such language in appropriate documentation to ensure the purposes of this section will be met.

LUO § 125-69(S)(6)(c) (June 13, 2006). In this case, the application parcel size is considerably less than five acres. Accordingly, the Planning Board did not require BHAPTS to propose open space language for recording in a deed or other instrument. Mills claims that based on subsection [5], however, recordable language is mandatory regardless of parcel size. Mills' interpretation finds no support in the text. Based on a plain reading of the open space standard, the language requirement of subsection [5] is subordinate to the five acre threshold requirement of [1]. As such, proposed open space language for incorporation into deeds is only required for application parcel sizes greater than five acres. The Planning Board did not err as a matter of law.

Although it is unclear, Mills seems to nevertheless argue that because the open space is not being used for public parks and gardens, clustering of the buildings is impermissible. For this argument, Mills harkens back to the Purpose and Intent section of the PUD-V, LUO Section 125-69(S)(1). That section provides that one of the purposes of the PUD-V is to "embody the principles

of: [1] Clustering of dwelling units to create public parks and gardens." There are multiple problems with Mills' argument.

First, the language on which Mills relies does not even mention open space. Second, the language highlighted by Mills is hortatory and general, not specific and directive. A specific requirement to dedicate open space within a private parcel to public parks and gardens was, understandably, not written into the Permitted Uses section of the LUO, Section 125-69(S)(1)(5), or the open space standard section of the ordinance, Section 125-69(S)(1)(6). Thus, there is no specific language in the LUO that says in order for open space to support clustering of dwelling units within a private parcel subject to a PUD-V application, the open space must be dedicated to public parks and gardens. Third, it is clear that the PUD-V intent language is addressed to the Town as a whole. By creating the PUD-V, the Town has created a process to encourage denser developments, thereby lessening Town-wide sprawl and creating more space throughout the Town for public parks and gardens. The Planning Board did not err as a matter of law by not requiring BHAPTS to dedicate the open space on its 1.54 acre private parcel to public parks and gardens.

5. **Set-Back Requirements**

The Court interprets Mills' argument on set-back requirements to challenge Section 2(b) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

> The Board finds that the development will meet the minimum lot standards for the Village Residential District. As allowed under section 125-69 S. (6)(d)[1], the Board moved to reduce the distances between buildings as required in section 125-67 B.(3) to the distances shown on exhibit 9.1.2 dated January 6, 2019 to allow the buildings to be clustered to create buffers and open space on the site.

Mills argues the Planning Board erred as a matter of law, because she claims reducing the distance between buildings can only occur to protect the public health, safety, or welfare, or address

11

particular site characteristics, and that creating buffers and open space does not accomplish any of those purposes.

The basic standard regulating the distance between buildings is set forth in LUO Section 127-67(B)(3). With regard to any application standard, the Planning Board is authorized to modify the standard "when necessary to protect the public health, safety, or welfare or to address particular site characteristics." LUO § 125-64 (May 5, 2003). With specific regard to the PUD-V overlay, "[t]he standards found in § 125-67 may be considered for modification in instances where the applicant adequately shows that the proposed application meets the purpose and intent of a PUD-V." LUO § 125-69(S)(6)(d)(3)(e) (June 13, 2006). The purpose and intent of a PUD-V include clustering, reducing negative impacts to the environment, following guidelines for the Great American Neighborhood, complementing visual character of the district, encouraging infill, freedom of design, flexibility and creativity in land development, and undertaking techniques which foster pedestrian access. LUO § 125-69(S)(1) (June 13, 2006). Reducing the distance between buildings to create buffers and open space meets all those purposes and intent. The Planning Board did not err as a matter of law.

6. **Affordable Housing.**

The Court interprets Mills' argument on affordable housing to challenge Sections 4 and 5 of the Findings and Conclusions of the Planning Board's May 8, 2020 Decision. Those sections provide as follows:

> 4. Per 125-69 S. (6)(b), the number of base affordable rent units is five. However, it was determined that the applicant only needs to provide three affordable rents units as the applicant received credit for two affordable rent units as follows: per 125-69 S. (6)(a)[2][e]-one unit for being pedestrian friendly and per 125-69 S. (6)[2][h] one unit for the provision of underground utilities.
> 5. The applicant shall have a total of 13 market rent units and three affordable rent units.

Mills argues the Planning Board erred as a matter of law, because she asserts the LUO requires BHAPTS to provide five affordable dwelling units, not three.[4] Mills also argues that the Planning Board's subsidiary finding regarding pedestrian amenities is unsupported by substantial evidence.

The parties agree that the base development density of the Project is eight dwelling units and that the maximum number of dwelling units is sixteen. The question is how many of those sixteen units can be market rate units, and how many must be affordable units. Another issue is how the Planning Board decided the question. BHAPTS points out that the language of Section 4 of the Findings and Conclusions of the Planning Board's May 8, 2020 Decision is not the same as the language of the formal motion that was passed by the Planning Board on that date. A transcript of the formal motion and vote are found in the record at Tab 8, and the applicable language provides as follows:

> And the planning board also finds based on LUO Section 125-69S (6)(b) that the number of base affordable units shall be 3, and finds that with the applicant providing 1 additional unit for the provision of underground utilities—that's a market unit—1 additional market unit for the provision of amenities as outlined in 125-69S(6)(a)(2)(e) for a total of 13 market units and 3 affordable units.

Tab 8, Town of Bar Harbor, Maine, Planning Board Meeting April 29, 2020 (Excerpt of Meeting), page 60 of the Excerpt.[5] BHAPTS refers to the difference between the formal motion and the wording used in Section 4 as a "transcription error," but no party offers evidence or an explanation for why Section 4 does not track the formal vote. In this case, the Court looks to the written transcript of the formal motion and vote as the most accurate description of the Planning Board's action and reasoning.

---

[4] The Court notes the irony of Mills' argument. Mills is arguing that the Planning Board got the affordable unit calculation wrong—not because she wants more affordable units—but because she wants to defeat the Project, thereby ensuring there will be no affordable units.

[5] Mills did not paginate the Record on Appeal, which makes it difficult to navigate the Record. For convenience, BHAPTS provided a paginated copy of Tab 8, and the excerpt is found on page 8-45 of the paginated version.

Mills objects on a variety of grounds, including that the expression of a single member of a board does not reflect the action of a board as a whole. *See Carroll v. Town of Rockport*, 2003 ME 135, ¶ 28, 837 A.2d 148. That is true, but not the situation here, where a single member of the Planning Board made a formal motion that was formally voted on and passed by the Planning Board as a whole. Further, the written transcript provides a sufficient record of the vote to support review on appeal. *See id.* And in the final analysis the difference in wording between the formal motion and Section 4 is, in effect, harmless. As plainly and consistently reflected in the formal motion and Section 5 of the Findings and Conclusions of the Planning Board's May 8, 2020 Decision, there is no ambiguity about the Planning Board's conclusion: "The applicant shall have a total of 13 market rent units and three affordable rent units." The salient question is whether the Planning Board erred as a matter of law in deciding that "[t]he applicant shall have 13 market rent units and three affordable rent units."

> The LUO provides in relevant part as follows:
>
> An increase in the number of dwelling units above the base development density shall be considered for the following provisions:
>
> [a] For every additional affordable dwelling unit, an additional market-rate dwelling unit may be allowed.
> . . .
> [e] For projects that propose to construct new pedestrian amenities to connect the proposed development to other areas, amenities or goods and services, an additional market-rate dwelling unit may be allowed.
> . . .
> [h] For projects that place all public utilities, other than stormwater management systems, underground on the application parcel, an additional market-rate dwelling may be allowed.

LUO § 125-69(S)(6)(a)[2] (June 13, 2006). The LUO also provides in pertinent part that "[i]n the final plan the minimum number of affordable units or lots must be 20% of the base development density." § 125-69(S)(6)(b).

14

As discussed above, the parties agree that the base development density is eight dwelling units. "An increase in the number of dwelling units above the base development shall be considered" based on a number of different options. § 125-69(S)(6)(a)[2]. First, "[f]or every additional affordable dwelling unit, an additional market-rate dwelling may be allowed." § 125-69(S)(6)(a)[2][a]. This provision provides a one-for-one increase in market rate units for each affordable unit. Thus, by providing three affordable units, BHAPTS is entitled to three additional market rate units. That brings the total dwelling units up to fourteen: eleven market rate units, and three affordable rate units. Next, for projects that propose to construct new pedestrian amenities, as in this case, "an additional market-rate dwelling may be allowed." § 125-69(S)(6)(a)[2][e]. That brings the total up to fifteen: twelve market rate units, and three affordable rate units. And for projects that place applicable public utilities underground, as does this Project, yet another "market-rate dwelling unit may be allowed." § 125-69(S)(6)(a)[2][h]. That brings the final total up to the maximum sixteen dwelling units: thirteen market rate units, and three affordable units. Accordingly, a straightforward reading of the LUO's plain language supports the Planning Board's decision to require BHAPTS to provide thirteen market rent dwelling units and three affordable rent units.

The Planning Board reached the correct conclusion, albeit by starting in a slightly different manner. Referring to Section 125-69(S)(6)(b), the Planning Board began its analysis by requiring BHAPTS to provide three affordable rent units. The LUO does not require that the Board to start its analysis in this fashion, and a better reading of the LUO begins with Section 125-69(S)(6)(a)[2], as discussed above. However, although Section 125-69(S)(6)(b) establishes a minimum number of affordable units, it does not prevent the Planning Board from requiring more than the minimum, as the Planning Board did here. Thereafter, the Planning Board's analysis tracks the LUO. By

15

requiring BHAPTS to provide three affordable rent units, BHAPTS was entitled to three market based units above the base development density of eight, pursuant to the one-for-one provisions of Section 125-69(S)(6)(a)[2][a]. That brought the total up to fourteen dwelling units: eleven market rate, and three affordable. The Planning Board then found that applicable public utilities will be placed underground, and in reliance on subsection [h] correctly allowed an additional market-rate dwelling. That brought the totals up to twelve market dwellings, and three affordable dwellings. The Planning Board also found that the Project constructs new pedestrian amenities,[6] and in reliance on subsection [e] correctly allowed another market-rate dwelling. That brought the totals up to the final tally of thirteen market dwellings, and three affordable dwellings. The Planning Board thus reached the correct outcome and did not err as a matter of law.

Nevertheless, Mills argues for a different interpretation of the LUO. Mills maintains, for example, that the Planning Board should have required an affordable unit for the eight base development density units. But that is not what the LUO says or requires. As discussed above, the LUO provides in pertinent part that "[i]n the final plan the minimum number of affordable units or lots must be 20% of the base development density." § 125-69(S)(6)(b). This language merely sets an overall floor, which the Project easily surpasses with three affordable units, and thus does not require that BHAPTS add to the tally an affordable unit for the base development units. Mills also insists that all of the second eight units must follow the one-for-one accounting set forth in subsection [a], which would require an additional four affordable units. But the LUO plainly does not require subsection [a] to be applied to all the new units before subsections [e] and [h] can be applied. In sum, the interpretation Mills urges (to defeat the Project, not to actually cause additional affordable units to be built) is inconsistent with the plain language of the LUO.

---

[6] Mills' objection to this finding based on lack of substantial evidence will be addressed below.

The Planning Board did not err as a matter of law in determining that the Project shall have a total of thirteen market rent units and three affordable rent units.

Mills also attacks the Board's finding that the Project will construct new pedestrian amenities. Mills' arguments on this point lack any merit and are particularly unpersuasive. The entire Project was reconceived and revised to be more pedestrian friendly by providing more open space, less vehicular access, and a pedestrian staircase to Woodbury Road. Woodbury Road is a dirt road commonly used by pedestrians and cyclists. Mills' protests that the staircase is not enough, or that Woodbury Road lacks sidewalks, are all unavailing. The Planning Board's finding regarding construction of new pedestrian amenities is amply supported by substantial record evidence.

7. **Failure to Make Affordable Housing Preferentially Available to Bar Harbor Residents**

The Court interprets Mills' argument on the affordable housing preference to challenge Section 5(a) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

> The Board finds that the applicant has demonstrated that the units shall be rented to qualified moderate-income buyers as defined.

Mills argues the Planning Board erred as a matter of law, although the basis for her legal argument is unclear. Mills does not claim the Planning Board's finding lacks substantial evidence in the record.[7]

The LUO provides in relevant part as follows:

> Affordable housing units shall be sold or rented to qualified moderate-income buyers as defined. Preference shall be given first to Town residents and then to employees of the Town or of a public school in Bar Harbor. A determination of

---

[7] Even if she did, her evidentiary argument would fail, given the substantial evidence in the record to support the Planning Board's determination.

17

preference shall only be instituted when the number of qualified and interested buyers exceeds the number of available units. When the number of units available exceeds the number of qualified and interested buyers, the owner shall advertise in a newspaper of general circulation that affordable housing is available for sale or rent.

LUO § 125-69(R)(3)(a) (June 13, 2006). The LUO also requires applicants to submit an "affirmative marketing plan" describing their proposed marketing efforts. § 125-69(R)(3)(k).

Here, the Planning Board's finding tracks the first sentence of Section 125-69(R)(3)(a) identically. The Planning Board did not in its finding reference the remainder of subsection (a), but it did not need to. The Planning Board referenced Section 125-69(R) in its introductory findings regarding the affordable housing preference, and further referenced the various subsections of Section 125-69(R) in later parts of its findings. It is clear that the Planning Board understood the requirements of subsection (a), and incorporated all of them "as defined." Moreover, contrary to Mills' assertions, the affirmative marketing plan submitted to the Planning Board by BHAPTS clearly satisfies the substantive requirements of Section 125-69(R)(3)(a). The Planning Board did not err as a matter of law in determining that BHAPTS satisfied the LUO's affordable housing preference.

8. **Affect Upon Adjacent Historic Properties.**

The Court interprets Mills' argument regarding adjacent historic properties to challenge Section 2(ll) of the Findings and Conclusions of the Planning Board's February 6, 2019 Decision. That section provides as follows:

> The Board finds that there are no historic and archaeological resources on the property as shown on exhibit 9V.

Mills argues the Planning Board erred as a matter of law, on the grounds that the LUO requires the Planning Board to consider historic sites in the area, such as on her adjacent Trust property, and not just on the application parcel itself. In this, her final argument, Mills finds success.

18

The LUO provides in relevant part as follows:

> Aesthetic areas and physical and visual access. All site plans will demonstrate that the proposed development will not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites, rare and irreplaceable natural areas, or any public rights for physical or visual access to the shoreline. . . . If the proposed development contains any areas identified in the Comprehensive Plan or by the Maine Critical Areas Program as rare and irreplaceable natural areas, these areas shall be included as open space and suitably protected by appropriate covenants and management plans.

LUO § 125-67(X) (May 3, 1999). Read in context, the clause "of the area" modifies not just scenic and natural beauty, but other area features such as aesthetics, historic sites, rare and irreplaceable natural areas, and physical and visual access to the shoreline. It makes no sense, in context, to interpret Section 125-67(X) as applying only to features found on the 1.54 acre application parcel itself. While it may be uncertain what constitutes the outer limits of "the area," that is not an issue for this case. The Trust property abuts the Project and is therefore well within "the area" the Planning Board was required to consider. Indeed, the subdivision provisions of Section 125-67(X)(2) explicitly reference the "neighborhood surrounding the subdivision," and while the subdivision provisions are not at issue here, the neighborhood concept easily encompasses Mills' Trust property.

BHAPTS does not dispute that the LUO required the Planning Board to consider undue adverse effects on adjacent historic sites. Rather, BHAPTS argues that the Planning Board did make the necessary inquiry, and there is substantial evidence in the record to support such an inquiry.[8] BHAPTS notes that a field botanist mapped the area and found invasive plants near the Trust's historic gardens and grounds. BHAPTS maintains those invasive plants constitute a threat

---

[8] BHAPTS's reference to a letter from the State Historic Preservation Officer is unavailing, since the letter says nothing substantive, and would unlikely constitute substantial evidence if Mills were mounting an evidentiary challenge.

to the historic gardens, and thus construction of the Project would help protect the historic gardens because the invasive plants would be removed as part of the construction process.

The problem with BHAPTS's argument is that the Planning Board made no such finding. Mills challenges the Planning Board's decision on this issue for an error of law, not lack of evidence. The LUO plainly requires the Planning Board to consider undue adverse effects on adjacent historic sites in the area, but instead the Planning Board merely found there are no historic sites on the application parcel itself. The burden on the Planning Board to conduct its review is not heavy (*undue* adverse effect), and the substantial evidence standard quite deferential, but the Court will not here imply findings or embark on an original inquiry the Planning Board failed to make. *Appletree Cottage*, 2017 ME 177, ¶ 9, 169 A.2d 396. On the basis of the record before it, the Court concludes the Planning Board erred as a matter of law by failing to consider whether the Project will have an undue adverse effect on historic sites in the area, which includes at a minimum on the adjacent Trust property.

## <u>CONCLUSION</u>

The Court affirms the Planning Board's February 6, 2019 and May 8, 2020 Decisions on all but one issue—undue adverse effect on historic sites in the area, including specifically on the adjacent Trust property. The matter is remanded to the Planning Board to make a finding on that one issue, consistent with this Order. The Planning Board can determine whether it already has sufficient evidence in the record to make its determination, or whether to take new evidence on that one issue.

SO ORDERED.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: **June 7, 2021**

_____
Michael A. Duddy
Judge, Business & Consumer Docket

ELIZABETH MILLS

    *Plaintiff(s)*

*v.*

TOWN OF BAR HARBOR,
and BHAPTS, LLC.

    *Defendant(s)*

Party Name:                                   Attorney Name:

*Elizabeth Mills*                             Arthur Greif, Esq.
                                            Gilbert & Greif
                                           82 Columbia Street
                                           PO Box 2339
                                           Bangor, ME 04402-2339

*Town of Bar Harbor*                          Edmund Bearor, Esq.
                                           Rudman & Winchell
                                           84 Harlow Street
                                           PO Box 1401
                                           Bangor, ME 04402-1401

*BHAPTS, LLC*                                 Andrew Hamilton, Esq.
                                           128 State Street #3
                                           Augusta, ME 04330

STATE OF MAINE                          BUSINESS & CONSUMER DOCKET
PORTLAND, ss.                           DOCKET NO. BCD-APP-2021-05


ELIZABETH MILLS,                    )
                                    )
         Plaintiff,                 )
                                    )
     v.                             )  ORDER GRANTING IN PART AND
                                    )  DENYING IN PART RECORD DISPUTE
TOWN OF BAR HARBOR and              )  MOTIONS
BHAPTS, LLC,                        )
                                    )
         Defendants.                )


Defendant BHAPTS, LLC, ("BHAPTS") has filed a series of motions disputing the contents of the Record on Appeal. The gist of BHAPTS' argument is that Paragraph 17 of Complaint the Complaint only appeals the narrow issue of whether the Bar Harbor Planning Board determined the proper number of affordable housing units for BHAPTS' site plan. BHAPTS also argues that for various reasons, Plaintiff Elizabeth Mills ("Mills") waived her right to appeal anything other than the proper number of affordable housing units. It follows, argues BHAPTS, that a large volume of material included in the Record of Appeal should be excluded. Mills contends that Paragraph 17 appeals a broader range of issues, that she did not waive any rights to appeal those broader issues, and thus the entire content of the Record of Appeal is necessary.

BHAPTS also argues, and Mills agrees, that Mills' June 3, 2020 application for administrative appeal should be made a part of the Record on Appeal.

Consistent with Maine's notice pleading doctrine, a Complaint in a Rule 80B case need only contain a concise statement of the grounds upon which a plaintiff contends he or she is entitled to relief. M.R. Civ. P. 80B(a). Accordingly, the Court is not persuaded by BHAPTS argument that

1

Paragraph 17 must be narrowly construed to only appeal the proper number of affordable housing units. The Court interprets Paragraph 17 to appeal the broader range of issues asserted by Mills. Whether Mills waived her right to appeal the broader range of issues she asserts are encompassed within Paragraph 17 is a matter for another day.

As a result, the Court grants in part BHAPTS' Restated Motion to Resolve Record Dispute, and orders that Mills' June 3, 2020 application for administrative appeal be made a part of the Record on Appeal. The Court denies in part BHAPTS' Motion to the extent it seeks to exclude material from the Record on Appeal. BHAPTS can address any waiver arguments in its brief.

Regarding its brief, BHAPTS has filed a series of motions asking to be able to supplement its brief if the Court the record dispute in favor of Mills and asking for additional time to supplement. Since the Court has decided the record dispute in favor of Mills, the Court now needs to address BHAPTS' request to supplement its brief.

The Court grants in part and denies in part BHAPTS Motion for Leave to Allow Supplement of Brief After Order on Record Dispute as follows. The Court provides BHAPTS with two options for how to proceed. In Option 1, BHAPTS withdraws its Initial Response Brief, and files a new Response Brief addressing all the issues raised in the appeal. In Option 2, BHAPTS leaves its Initial Response Brief as is, but files a Supplemental Response Brief limited to no more than six pages. By NLT than Friday, February 26, 2021, BHAPTS must notify the Court and the parties which option it selects. BHAPTS must then file its new Response Brief or its Supplemental Response Brief, depending on which option it selects, by no later than March 19, 2021. Thereafter Mills will reply as provided for in M.R. Civ. P. 80B(g) and may ask for reasonable additional time if she needs it.

All other motions relating to the record dispute are denied as moot.

2

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated:_ February 24, 2021__        _____/s/_____

                                         Michael A. Duddy
                                         Judge, Business and Consumer Docket

*ELIZABETH MILLS*

> *Plaintiff*

*v.*

*TOWN OF BAR HARBOR and*
*BHAPTS, LLC*

> *Defendants*

Party Name:                                              Attorney Name:

*Elizabeth Mills*                                         *Arthur Greif, Esq.*
                                                         **Gilbert & Greif**
                                                         PO Box 2339
                                                         Bangor, ME 04402-2339

Town of Bar Harbor                                       Edmond Bearor, Esq.
                                                         **Rudman & Winchell**
                                                         PO Box 1401
                                                         Bangor, ME  04402-1401

BHAPTS, LLC                                              Andrew Hamilton, Esq.
                                                         **Eaton Peabody**
                                                         PO Box 1210
                                                         Bangor, ME 04402-1210